Joseph **KOLPAK** and Theresa Kolpak, Administrators of the Estate of John Kolpak, Plaintiffs,

v.

Richard **BELL**, et al., Defendants.

No. 82 C 4705.

United States District Court, N.D. Illinois, E.D.

Aug. 14, 1985.

---

Thomas J. Esler, Chicago, Ill., for plaintiffs.

Robert John Connor, Sp. Asst. Atty. Gen., Illinois Dept. of Mental Health and Developmental Disabilities, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This civil rights action was brought by Theresa and John Kolpak, administrators of the estate of their son, John Kolpak. The case is now before the court on the motion for summary judgment of nine of the eleven named defendants. (An order of default was entered on March 8, 1983 against defendant Larry Sims. Fed.R. Civ.P. 55(a). Defendant Jesse Johnson has not yet been served and is not a party to the present motion.) The motion is granted in part and denied in part.

### Introduction

In the first count of their three-count amended complaint, plaintiffs claim that the treatment their son received while in defendants' custody deprived him of his rights under the first, fourth, fifth, and fourteenth amendments of the federal constitution. As a result, plaintiffs allege that defendants violated 42 U.S.C. §§ 1983, 1985, and 1986. In the second and third counts, plaintiffs allege that this treatment violated their son's rights under Illinois statutory and common law principles. As administrators of John Kolpak's estate, they seek declaratory relief, compensatory damages of seven million dollars, and attorney's fees and costs.

The events leading up to John Kolpak's tragic death and the filing of the present action began when he was admitted to the Waukegan Developmental Center ("WDC") in Waukegan, Illinois. The WDC, run by the Illinois Department of Mental Health and Developmental Disabilities ("IDMHDD"), is a state institution equipped to provide care for severely mentally retarded adults. Built in 1975, the WDC consists of five Units, a main administration building, and a schoolhouse arranged around a circular grass field. Each Unit consists of ten Homes, each containing a kitchen, two bathrooms, living and dining areas, a day room off the kitchen, an outdoor patio, a utility room, and four bed-

rooms. From six to nine persons reside in a Home.

On March 31, 1981, John was admitted to Unit 1, Home 9 of the WDC, where he shared a bedroom with two other residents. By July 18, 1981, after numerous, less serious reported injuries, John Kolpak had died of a severe beating sustained while in the custody of IDMHDD employees. Plaintiffs filed this action on July 29, 1982 against various named and unnamed employees and agents of the IDMHDD. All of the defendants are sued both in their individual and official capacities.

### Factual Discussion

#### A. General Background

The parties do not dispute the events leading up to John's institutionalization. John was born in Chicago, Illinois on October 26, 1953. At the age of seven years, he was diagnosed as severely retarded. Also at that age, as a result of disease and other physical disorders, John lost the ability to speak a recognizable language. John was thereafter characterized as "nonverbal," which means he could understand and respond to verbal instructions in English and Polish, but could communicate his needs only through sounds and hand and body movements. Because of John's disabilities, he was denied admission to the Chicago Public Schools, and attended special schools between ages 12 and 25.

At the age of 25, John underwent testing directed to determining a suitable living situation for him. Theresa and John Kolpak, entering their mid-fifties, were concerned about their future ability to care for their son and sought an appropriate residential facility. After testing was concluded on March 30, 1981, plaintiffs concluded that the WDC was a readily available, suitable institution for John. Neither party asserts that John himself knowingly or voluntarily chose to enter WDC. On March 31, 1981, John was transported to the WDC by ambulance. He was assigned to Unit 1, Home 9, which was characterized by defendant James McKinley as a home for "problem residents." Several defendants admit that John did not pose disciplinary problems. (Amended Answer ¶ 17.)

John's treatment while at the WDC is the subject of this action. The present factual record of the course and professional adequacy of that treatment is spotty at best. Thus, it is important to keep in mind the procedural posture of the case. As defendants have moved for summary judgment, they have the burden of showing that there is an absence of any genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This is so even though plaintiffs will eventually have the burden at trial of showing their entitlement to relief by a preponderance of the evidence.

In scrutinizing a motion for summary judgment, a court must draw all reasonable inferences in favor of the non-movant. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984); *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). In addition, a movant may not simply question the factual accuracy of the non-movant's pleadings. If the movant does not adduce evidence tending to controvert those pleadings and to establish entitlement to judgment as a matter of law, the non-movant is not obligated to produce evidence in order to defeat the motion for summary judgment. *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). These principles concerning the burden of proof are especially important in a case such as this where the factual record is replete with omissions relevant to crucial elements of defendants' arguments. *See, e.g., Adickes,* 398 U.S. at 157–158, 90 S.Ct. at 1608–1609.

#### B. Defendants' Duties at WDC

The parties have provided the court with portions of several defendants' deposition testimony. That evidence and the pleadings illuminate the roles and responsibilities of the defendants. At the relevant

times, defendant Richard Bell was a Service Area Coordinator of the IDMHDD. In this position, Bell supervised the Unit Administrators of Units 1 and 2 of the WDC. (Bell Dep. at 10–11.) It appears from Bell's deposition that his supervisory responsibilities did not include direct review of every event occurring in the various Homes. Rather, Bell would have regular sessions with the Unit Administrators. (*Id.* at 28.) In addition, Program Coordinators and Home Managers would occasionally meet with Bell. (*Id.* at 10–11, 28.) Reports from the Unit Administrators would include any indication "of any problems or major difficulties." (*Id.* at 11.) Bell explains, "I would get general reports about how programs were functioning but not in detail unless there was a problem, and then I would get significant detail." (*Id.* at 27–28.) In addition to holding direct meetings with subordinates, Bell would review Home records as part of his supervisory tasks. Such records include so-called Special Injury Reports and Special Incident Reports. (*Id.* at 62.) (The court will refer to these reports simply as injury reports and incident reports. A description of the reports will be provided below.) According to Bell, after such a report had been completed, "[e]ither I would review them or my administrative assistant would review them and bring those to my attention that he felt were even vaguely questionable." (*Id.*)

Defendant Robert Day was the Unit Administrator for Unit 1 at the times relevant to the complaint. Day testified that his responsibilities included protection of the health and safety of from 80 to 120 mentally retarded adults and the supervision of from 120 to 126 employees. (Day Dep. at 6.) Bell testified that Unit Administrators supervised Home Managers (Bell Dep. at 10–11), and this is consistent with Day's description of his duties (Day Dep. at 51). Day indicated that he reviewed injury reports as a matter of course. (*Id.* at 50.) It is also clear that he reviewed incident reports (which were kept in the Home for the Home Manager's use), talking to the Home Manager about a specific report "[i]f it require[d] it." (*Id.* at 51.) Finally, Day

could and likely did make specific decisions about Home routines. For example, Home Manager Larry Hudson testified that Day probably was responsible for the decision to do extra "body checks" on John as a way of locating the source of his injuries. (Hudson Dep. at 30.)

Defendant Larry Hudson was the Home Manager for Unit 1, Home 9 while John resided there. (Hudson Dep. 28–29.) Hudson's deposition reveals that his duties included supervision of the technicians. (*Id.* at 54–55, 60–61.) It is also clear that, perhaps unlike Day and Bell, Hudson's job brought him in frequent contact with the Home residents, since Hudson often made entries in the Home logs and observed John in person. (*See, e.g., id.* at 40, 42.) Thus, Hudson's supervision of the daily Home activities was close. When asked whether he read the special chart directed to determining the source of Kolpak's injuries, Hudson said he probably did, noting, "I wanted to be aware of everything that was happening." (*Id.* at 38.)

Defendant John Miller was a Program Coordinator during the relevant period. Plaintiffs provide no other description of his duties. Miller states that he served primarily as Home Manager for Home 7, and was Program Coordinator for Unit 1, Home 9 on July 18, 1981 solely because of the rotating weekend schedule for Program Coordinators. Miller stated that as Program Coordinator, he does not come into contact with residents' records. Defendant Arnold Wolochak was a Social Worker for John's Home. His tasks included pre-admission counseling and counseling of verbal residents. (Wolochak Dep. at 5–7.) Thus, he *did not* counsel John, since John was nonverbal. (*Id.* at 5.) It is also clear that Wolochak's duties did not include supervision of residents at the WDC.

The remaining defendants are those who maintained close, daily contact with John. James Hahn (incorrectly spelled "Holn" in the amended complaint) and James McKinley were technicians assigned to the first (morning) shift of Unit 1, Home 9. Larry Sims was a technician assigned to the third

(night) shift of John's Home. (Plaintiffs allege that defendant Johnson was a technician in Home 9, while defendants contend he was a technician in Home 10. This dispute is not before the court, since Johnson has not been served and is not a party to the present motion.) Gay Williams was the Shift Leader for the third shift. While no description of the technicians' duties is provided, it is clear from the depositions that technicians closely supervised residents, helping them with their hygiene and their daily activities and programs. Technicians were also responsible for observing the residents and making the required entries on the incident and injury reports. (Bell Dep. at 62.) Mary Canty was the registered nurse for the first shift. It is not clear whether her duties included daily or scheduled visits to the residents. However, she would be summoned if a technician or other person observed a medical problem or injury. Moreover, her treatment of residents would include visits to the residents' Homes. (*See generally* Canty Dep.)

## C. *John's Stay at WDC*

Plaintiffs claim that each of these defendants is responsible for John's death in one or more ways. Specifically, plaintiffs claim that some defendants' care for John was grossly negligent. For example, according to plaintiffs, Canty's emergency medical care or the technicians' completion of special injury or special incident reports was professionally inadequate. Additionally, plaintiffs allege that defendants recklessly ignored the series of injuries sustained by John before the night of his fatal beating by failing to document the injuries and failing to take minimally adequate protective measures. Finally, plaintiffs claim that defendants conspired to conceal evidence of their recklessness.

To assess the accuracy of these allegations, the court must review the history of John's short stay at the WDC. These facts are elicited primarily in Larry Hudson's deposition. In that deposition, Hudson is questioned on the various reports documenting noteworthy events in John's life. These reports include the special injury and incident reports mentioned above, as well as the house and medical logs.

Special incident reports were used to document every unusual occurrence, including injuries, while special injury reports were for documenting all injuries. An injury should be noted in both incident and injury reports. (Day Dep. at 49.) Normally, a technician or nurse would complete these reports, since they were most frequently on hand to make the observation. (Bell Dep. at 62.) The exact circulation of the reports is unclear. Injury reports appear to have been given to the Unit nurse for review, then to the Unit Administrator, then to "medical services," and finally to the "facility director." (Day Dep. at 50.) Bell also reviewed these reports. (Bell. Dep. at 62.) Incident, but not injury, reports were retained in the Home for the use of the Home Manager. (Day Dep. at 51.) (Of course, as mentioned above, incident reports should duplicate the information contained in the injury reports.) The house log was a journal kept in the Home in which employees would note all unusual incidents and special instructions. The medical log was also kept in the Home, and contained notes of medical treatment. (Hudson Dep. at 32.)

In his deposition, Hudson refers frequently to these documents. Sometimes it is unclear to which document he is referring, since the court has not been provided with the deposition exhibits or the logs and reports. However, Hudson's testimony does provide a useful chronology of John's three and one-half months at the WDC.

John's first documented injury is found in the medical log in an entry dated April 14, 1981. (Hudson Dep. at 32–33.) That entry, by Hahn, indicates that when the first shift came on duty that morning, John was found with a bloody lip, but no apparent bruises or cuts. The next entry in the same log, signed by mental health technician Linda Chatman, reveals that on April 17, 1981, an x-ray of John's right hand was taken. (*Id.* at 33.)

No other details on this incident were contained in the medical log, although details are provided in a document referred to as "Canty Group Exhibit 2." This document, which remains unidentified, contains this notation for April 17, 1981:

Drowsy and staggering. Noted right hand swollen and infected abrasion on upper surface. Dr. Goldman notified 2:15 p.m. Ordered x-ray. Mary Canty.

(Id. at 34.) After that entry is another indicating that John's parents had visited him at 2:00 and noticed his swollen right hand. In this same log is an entry that Theresa Kolpak visited John on April 22, 1981. (Id. at 35.) On April 23, Larry Hudson made the following entry:

Mrs. Kolpak called me today and expressed concern about the swelling and bruising on John's hands, arm, lip and stomach. I informed her that a report would be made. A report will be made and she will be kept informed of any future developments.

(Id. at 36.) Hudson could not remember if he did contact the nurse, but testified that is what he usually would have done. (Id. at 36–37.)

On April 26, 1981, an Arthur Thompson noted in Canty Group Exhibit 2 that, "John's body check was made. I found the same marks as yesterday. A report made." (Id. at 37.) There is no indication as to whether these "marks" had any relation to the injuries noted on April 14, 17, or 22.

A May 4, 1981 entry in Canty Group Exhibit 2 indicates that, "At 9:45 Mrs. Kolpak came to visit John, and John had to be taken to the hospital. John was taken to St. Therese Hospital for x-rays for his left hand. There was slight swelling." (Id. at 38–39.) Later that day, another entry reveals that, "John was taken to his room to sleep and the staff took his shoes and socks off. It was then noticed that John's feet, toes and ankles were bruised and swollen. Nurse was notified." (John was taken to see a doctor for these injuries on May 5, 1981.) Further below this entry is another entry made at 2:30 p.m.:

Effective today and until further notice John will be on a one-on-one staff observation assignment during his waking hours. Also effective today third shift will be making nightly body checks at the beginning and end of their shift along with the first and second shifts.

(Id. at 39–40.)

A May 5 entry indicated that John had been taken to see a doctor, according to Hudson for the injuries observed on May 4. (Id. at 41.) Also on May 5 is a note that Theresa Kolpak called asking about the results of John's x-rays "yesterday." Hudson was unable to remember what those x-rays were for. (Id.) On May 8, 1981, according to Canty Group Exhibit 2, John saw a doctor for bruises and swelling in both ankles. (Id. at 42–43.)

Apparently John also suffered from blood in his urine at some point. Hudson remembers that problem and that John made frequent trips to the urology clinic. (Id. at 48.) Canty testified that on July 14, 1981, John flinched when touched in the kidney area. (Canty Dep. at 78.) She stated, "I just knew he had kidney complications." It should be noted that the July 19, 1981 autopsy report of the Lake County Coronor's Office confirms that John sustained multiple fractures with internal injuries and hemorrhage to the left kidney, with blood in the urine. (Amended Complaint ¶ 30; Defendants' Answer to Amended Complaint, filed 6/20/84, ¶ 30.)

Not counting the incidents of blood in the urine, the logs discussed in Hudson's deposition may document as many as eight injuries from March 31 through May 8, 1981. This number may in fact have been higher, since the evidence suggests that the staff was either not noticing or not reporting evidence of all injuries. For example, in two cases, injuries were reported only after John's mother brought them to the staff's attention. In addition, Hudson testified, when asked about omissions in the medical log, that "a lot of the staff there at the facility just don't know the correct way of documenting information like that." (Hudson Dep. at 35.) When asked about the

recording of orders in the appropriate logs, Hudson further testified that not all orders are recorded; "things like that happen quite often." Because the court has no evidence on the cause of blood in John's urine before July 18, 1981, it cannot determine that this was further evidence of abuse.

John's last injury allegedly occurred sometime between the evening of July 17 and the morning of July 18, 1981. (Amended Complaint ¶ 30.) Defendants contend that defendant Larry Sims (against whom a default has been entered) was responsible for the fatal beating. (Defendants' Memorandum in Support, filed 7/1/84, at 12.) Jay G., a friend of John's and a Home 9 resident, testified that he saw Sims beat John. (Jay G. Dep. at 5–6, 9.) Defendants, in their answer, admit that the coroner's report indicates external trauma to have been the cause of John's death. All of the defendants who have answered have denied beating John.

Because the evidence supports defendants' theory that Sims beat John sometime during the third shift between July 17 and 18, 1981, the court must determine whether the moving defendants had any indirect responsibility for John's death. The court has already described generally the duties that defendants owed John by virtue of their employment with IDMHDD. In addition, several defendants were questioned specifically on their personal knowledge of John's stay at WDC.

Service Area Coordinator Bell was questioned in his deposition about the predictability of the fatal attack:

A. There was nothing in those reports that would have prevented or indicated that such a savage attack was going to take place on him.

Q. Perhaps not a savage attack, but was there anything that might have indicated that there was a pattern of abuse emerging?

A. I could not see a pattern of abuse. There was really no pattern to the incidents.

(Bell Dep. at 109.) There is no evidence of whether Bell properly exercised his supervisory duties with regard to John; such duties included the review of the special injury and incident reports, as well as the receipt of "significant detail" regarding any "problems." Rather, the court is told only that from the reports, Bell could not detect a pattern of abuse.

Administrator Day probably had some responsibility for ordering special "body checks" on John. A full body check occurs when a staff member views the entirely unclothed body of a resident. (Hudson Dep. at 21.) According to Hudson, a full body check is done every day at every shift change and whenever a resident goes on an outing. (*Id.* at 20–21.) Hudson provided the following description of the procedures for carrying out body checks:

Q. So at the beginning and end of each shift all the students are undressed completely?

A. Yes.

Q. And they are in their rooms?

A. In the privacy of their own rooms.

Q. And that goes on every day?

A. Every day.

　　　*　　*　　*　　*　　*　　*

Q. And the incoming staff would do a body check with the outgoing staff?

A. Usually the incoming staff will do the body check but not with the outgoing staff unless there is something unusual happening and we are asked to pay specific attention to that particular resident.

Q. The second shift usually does the body check during the course of the shower?

A. Yes.

Q. When does the first shift do theirs?

A. In the morning during hygiene or when they get them up in the morning for their showers and toothbrushing and hand washing and face washing. That routine.

Q. If they take showers in the morning?

A. They usually do in my home. . . .

Q. But your home has that custom and practice?

A. Yes.

Q. When does the third shift do the body check?

A. When they come in at night.

\*　　\*　　\*　　\*　　\*　　\*

Q. Have you ever done any special body checks?

A. Yes.

Q. How often have you done that?

\*　　\*　　\*　　\*　　\*　　\*

A. It is infrequent but usually it will last until we are told to discontinue it.

Q. What would be the purpose of a special body check?

A. To determine whether or not a resident is sustaining injuries inside of the home or outside of the home, whether it's resident related or staff related, whether it's self-abuse or suspected self-abuse.

Whether it could be medically related to some outside factor.

(*Id.* at 21–22, 23–24.) (Shift Leader Williams' testimony seems to contradict this description of frequent body checking. (*See* Williams Dep. at 18.)

It appears that John was subject to special body checks at some point in his stay. Such a special check would be one where the incoming and outgoing staff would perform a body check at the same time. The earliest evidence of such a check is the May 4 entry described by Hudson ordering the third shift to execute its body check with the first and second shifts. According to Hudson, a separate log on a separate clipboard was kept on John's body checks. (Hudson Dep. at 30.) Day, however, remembers that the special body checks were done five or six weeks before July 18, which would mean they started in the first or second week of June 1981. (Day Dep. at 83.) However, Day's testimony is consistent with a theory that special checks had been started earlier:

Originally [special body checks were] asked for by a nurse and done for a while. I am not sure as to whether it was discontinued and started again by myself or I just picked up on something that had been started.

(*Id.*) Hudson testified concerning the origin of the special checks:

Originally I think it was the home staff idea because the parents had been noticing things that we really couldn't see because John was new to us, and we didn't know what to look for.

(Hudson Dep. at 30.) Although special body checks were ordered at some point, Hudson could not remember whether they were ever carried out. (*Id.* at 44.)

It is clear that special body checks are unusual at WDC. Hudson testified they were "infrequent." Shift Leader Gay Williams testified that she had never before kept special charts on other students for body checks at the beginning and end of a shift. (Williams Dep. at 18.) In the following exchange, Hudson noted the special circumstances of John's case:

A. The staff was, like I say, the usual routine is to check anyway but not to keep special records unless there was something unusual, *extremely unusual like in this case.*

Q. Well, there was something unusual; he was getting injured or bruised, and you didn't know why?

A. No, I didn't know why.

Q. But you knew it wasn't normal, it was not your reading of what should be an acceptable level of injury?

A. True.

(Hudson Dep. at 43–44 (emphasis added).)

This characterization of John's injuries as "extremely unusual" should be contrasted with Bell's testimony that the reports do not show a pattern of abuse. In addition, when asked if there was "an unusual frequency of bruises or injuries" to John, Hudson replied:

No more so than anyone else. Residents were constantly fighting amongst themselves or pushing one another and scratching themselves in some way or another.

(Hudson Dep. at 30–31.) The special body checks, Hudson testified at this point, were done largely because of John's parents' concern and because John was new to the staff. (*Id.* at 31.) At one point, Day seems to say that the special body checks were started because of a rash. (Day Dep. at 83.)

Thus, there is inconsistent testimony regarding the reasons for the special body checks, the execution of body checks generally and the special checks in this case, and the starting date for the checks. In addition, it is helpful to note at this point that the usefulness of special or regular body checks depends on the faithfulness of their execution along with the proper completion of reports and the review of those reports by persons competent to interpret them. There has already been testimony that reports generally and in this case were frequently not completed as required. In addition, Home Manager Hudson revealed that he was unqualified to make judgments about the injuries he and other staff members were supposed to be documenting:

Q. Did you ever have any training on identifying the origin or location of a bruise as possibly constituting abuse?

A. No.

Q. Or being a telltale mark that that might be, that that person has that bruise just might be a victim of abuse?

A. I never had any training like that.

Q. Have you ever had any training on identifying injuries or reports of injury frequency or a number or type as possibly constituting abuse and requiring further investigation by you as the home manager?

A. Not that I can remember now.

(Hudson Dep. at 20. *See* also 27–28.) After attempting to describe how to differentiate various types of bruises, Hudson explained:

Usually what is done is we report a bruise as a bruise. We cannot really draw our own conclusions. We leave that to our supervisors. The only thing we can do is report what we find. * * * The location of [the bruise] and size of it

and about what time it happened or the time it was discovered.

(*Id.* at 25.) There is no evidence that any of the medical personnel had any expertise in identifying patterns of abuse or in differentiating accidents from self-initiated or other abuse.

The evidence of faulty record-keeping by the staff and failure to follow procedures should be viewed in light of other evidence tending to suggest an atmosphere in which abuse could occur. Hudson testified that, while he could remember no incidents of staff members abusing residents, several times he had to transfer technicians or change their shifts in order to alleviate stress. (Hudson Dep. at 54–55, 60.) In addition, Hudson frequently gave technicians time off as a way of lessening levels of tension; Hahn in particular took time off for this reason. (*Id.* at 61.) There is evidence that residents frequently abused each other, and that Home 9 contained "problem" residents. And, evidence exists that technicians in charge of Unit 1, Home 9 were negligent in other respects. For example, McKinley admitted in his answer that he had stated that 60% of the time when he came on duty, Home 9 would be below acceptable standards, with residents lying in urine-soaked beds. (Amended Answer ¶ 32.).

The events of the morning of July 18, 1981 are fairly clear. Two technicians on the first shift, James Hahn and James McKinley, checked John that morning. Hahn noted that John was pale and breathing rapidly. In addition, he was not responsive, his hands were shaking, his eyes were unfocused, and he was sweating. (Hahn Dep. at 46–47.) Hahn asked Sims, who was in the bathroom, whether he knew if something was wrong with John and Sims replied that "he had been doing that most of the night." (*Id.* at 47.) McKinley observed that John had a small trickle of blood coming from his nose. His eyes were half open and his fists were balled. (McKinley Dep. at 70.) McKinley called a nurse.

370

Nurse Canty was the nurse summoned to attend to John. She testified that when she first observed him, he was pale but responsive with a small amount of blood under his nose. (Canty Dep. at 61.) She thought his problem had something to do with his kidneys, and she told Hahn and McKinley to keep John in bed while she called a doctor. (*Id.* at 82.) While John's problem appeared to be an emergency, she phoned Dr. Wineberg from the schoolhouse, and not John's home, because there was less noise in the schoolhouse. (*Id.* at 84.) She did not think John was in shock, or pre-shock, nor did she believe he was dying. (*Id.* at 84–85.) After phoning Wineberg and getting his answering service, she waited in the schoolhouse from 7:00 to 7:15 for his return call. When the doctor did return the call, he suggested she call urologist Dr. Kumar. (Canty had told Wineberg she thought John's problem was "connected with the kidney problems.") (*Id.* at 86.) Canty attempted but failed to reach Kumar, at which point (7:45) she returned to examine John. (*Id.* at 87.) Since John's condition had not changed, Canty returned to the schoolhouse and called Wineberg again. He told her to bring John to the hospital, and she returned to the home to prepare John, with Hahn and McKinley, for the trip. (*Id.* at 87, 91–92.) During these activities, John was given no treatment.

In their answers, several defendants indicate that John fell out of bed on the morning of July 18, 1981. Since no one argues that such a fall could have been the cause of death, the court need not address this factual question. The evidence concerning the fall is important to judging Canty's credibility, since she told plaintiffs that John was going to the hospital because he fell out of bed. However, a credibility determination need not be made on this motion.

Dr. Helen Young, the pathologist from the Lake County Coroner's Office, who performed the July 19, 1981 autopsy, testified that her expert opinion was that John could not have survived the beating. (Young Dep. at 76.) This evidence remains uncontroverted.

**Legal Discussion**

Defendants base their motion for summary judgment on several grounds. The court will discuss each ground separately.

*A. Eleventh Amendment*

■ As mentioned above, plaintiffs sue defendants in their official and individual capacities. Defendants argue that they are immune from suit under the eleventh amendment. The court finds that the eleventh amendment bars this action in its entirety against the defendants to the extent they are sued in their official capacities.

Before addressing the eleventh amendment defense, the court notes that eleventh amendment immunity is defendants' only challenge to the state law claims. Thus, if defendants may be sued in federal court for violations of state law, the state law claims may remain in the case under the court's pendent jurisdiction. In addition, defendants raise the eleventh amendment defense in their supporting memorandum only with respect to the second and third counts, which contain the state law claims. (Defendants' Memorandum in Support, *supra*, at 20–21.) In their reply memorandum, defendants appear to raise the eleventh amendment as a bar to the first count, containing the federal constitutional claims. (*See* Defendants' Memorandum in Reply, filed 9/11/84, at 13–14.)

■ Even if the defense had not been raised as to all counts, however, this court would have to determine the availability of the defense on its own motion. This is because the eleventh amendment defense is in the nature of a jurisdictional bar that can be raised at any stage of the proceedings. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 907 & n. 8, 79 L.Ed.2d 67 (1984). The defense is not wholly jurisdictional (such as subject matter jurisdiction), since the state may waive the defense by expressing unequivocal consent to suit.

*State of Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449, 460 (6th Cir.1982). However, because waiver of the defense requires express consent by the state, the court finds the defense sufficiently jurisdictional that it may be raised by the court on its own motion. *See, e.g., Mathes v. Nugent,* 411 F.Supp. 968, 971 (N.D.Ill.1976) (court raises defense sua sponte). Thus, the court will consider the eleventh amendment defense as to all counts.

In *Kentucky v. Graham,* —— U.S. ——, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Supreme Court analyzed the distinction between suits against state officials in their individual (or personal) and official capacities. The Court's explanation is useful and pertinent to this case, and will thus be quoted at some length here:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. [Citation omitted.] Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." [Citation omitted.] As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. [Citation omitted.] It is *not* a suit against the official personally, for the real party in interest is the entity.
>
> \* \* \* \* \* \*
>
> When it comes to defenses of liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law. [Citations omitted.] In an official-capacity action, these defenses are unavailable. [Citation and footnote omitted.] The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.

105 S.Ct. at 3105–06. *Brandon v. Holt,* —— U.S. ——, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985) (Supreme Court expressly holds for first time that suit against public servant in official capacity "imposes liability on the entity that he represents"); *see also Kolar v. County of Sangamon,* 756 F.2d 564, 567–68 (7th Cir.1985).

■ To the extent that plaintiffs have sued defendants in their official capacities, the suit is deemed one against the State of Illinois or one of its agencies. Since the parties agree that the state has not consented to this suit in federal court, the extent of the state's eleventh amendment immunity must be examined. Liability here is premised on defendants' constitutional violations, as well as their violations of Illinois statutory and common law. Monetary damages are requested in all counts, while a declaration that "the policies and practices complained of are illegal and unconstitutional" is requested only in the count brought for federal constitutional violations.

■ Clearly a suit against the state for monetary damages or other retroactive relief is barred by the eleventh amendment, regardless of the predicate for liability. *Edelman v. Jordan,* 415 U.S. at 666–67, 94 S.Ct. at 1357 (1974); *Pennhurst State School & Hospital v. Halderman,* 104 S.Ct. at 909 (1984). Thus, the motion for summary judgment is granted as to all claims for monetary damages against the defendants to the extent they are sued in their official capacities.

■ Plaintiffs have also requested declaratory relief against defendants in their official capacities. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), established that to the extent a state official is acting in violation of the federal constitution, a suit for injunctive relief is not a suit against the state, since the official's actions are considered void, or *ultra vires.* (*Pennhurst,* of course, holds that a state official who violates state statutory or tort law is *not* acting without authority, and cannot be sued in his or her official capacity in federal court for any purposes absent valid consent by the state. 104

S.Ct. at 911–17. Plaintiffs do not request declaratory relief in their state law counts.) Hence, a federal court's order of prospective injunctive relief against the official is consistent with the eleventh amendment, since the underlying suit is not deemed one against the state. *Edelman* makes clear, however, that even when a state official has acted unconstitutionally, the eleventh amendment does not allow a federal court to order retroactive relief against the official. 415 U.S. at 666–67, 94 S.Ct. at 1357.

■ A question would be raised whether plaintiffs' request for declaratory relief falls outside of the eleventh amendment if the request for declaratory relief were a valid one. However, plaintiffs' request for a declaration, to the extent it is directed to instructing the state officials on their constitutional duties for future reference, was mooted before the filing of this suit, upon John's death. Plaintiffs are not representing a class of other residents of the WDC so that declaratory relief might be appropriate, hence the claim for declaratory relief must be stricken. Defendants' motion for summary judgment is therefore granted as to the claims brought against them in their official capacities.

■ Defendants also contend that the state law counts should be dismissed in their entirety under *Pennhurst*. In *Pennhurst*, the Supreme Court examined the power of a federal court to enjoin state officials to conform their behavior to state law. Because the decree would act against the state, since it would require state officials to comply with the federal injunction in the performance of their state-created jobs, the suit was clearly against the officials in their official capacities. 104 S.Ct. at 912 n. 17. The Court held that where state officials violate state law, as opposed to federal constitutional law, their actions are still considered actions of the state for purposes of the eleventh amendment. Thus, absent state consent, a federal court could not enjoin the state officials to conform their behavior to state statutory or common law.

■ Defendants interpret this opinion as holding that a federal court can never entertain a state law action against a state official. This is not true, however, for suits against the state official *individually*. *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689–90, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1949); *Toledo, Peoria & Western Railroad Company v. State of Illinois*, 744 F.2d 1296, 1299 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985); *see Pennhurst*, 104 S.Ct. at 914 n. 21. Defendants have not shown how a suit for monetary damages against a state official personally, whatever the predicate for liability, would "expend itself on the public treasury or domain, or interfere with the public administration" or "restrain the [state] Government from acting or . . . compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). The fact that Illinois may statutorily indemnify defendants (an issue not raised by defendants) would not convert a judgment against individual defendants into one against the state. *Spruytte v. Walters*, 753 F.2d 498, 512 n. 6 (6th Cir. 1985); *Demery v. Kupperman*, 735 F.2d 1139, 1146–1149 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985); *Foster v. Day & Zimmermann, Inc.*, 502 F.2d 867, 875 (8th Cir.1974); *McAdoo v. Lane*, 564 F.Supp. 1215, 1217–1220 (N.D.Ill.1983). Thus, all counts must go forward against defendants individually.

In conclusion, defendants' motion for summary judgment on certain claims under the eleventh amendment is granted as to all counts against defendants in their official capacities and denied as to all counts against defendants in their individual capacities. The request for declaratory relief is stricken.

### B. Claims Under the First, Fourth, and Fifth Amendments

■ Plaintiffs' claims under § 1983 are predicated on violations of the federal first, fourth, and fifth amendments, as well as of

substantive and procedural due process. Defendants are correct that violations of these provisions are not immediately apparent from the allegations or evidence. For example, there are no allegations of restriction of John's freedom of speech or religion, or his rights peaceably to assemble or to petition the government for redress of grievances. The warrant and search and seizure requirements of the fourth amendment and the indictment, double jeopardy, self-incrimination, and just compensation requirements of the fifth amendment also appear to be irrelevant to plaintiffs' factual allegations.

Plaintiffs, however, argue that the "peripheral protection" provided by these amendments may well have been violated by defendants in this case. (Plaintiffs' Memorandum in Response, filed 8/21/84, at 45–46.) Specifically, plaintiffs point to the holding of *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), that "specific guarantees in the Bill of Rights have penumbras" and the fourth and fifth amendments have been found to protect "the sanctity of a man's home and the privacies of life." The court agrees with defendants that the privacy interests created by *Griswold* and its progeny do not apply to a case involving deprivation of life. The parties have not been able to find a case supporting plaintiffs' construction of *Griswold,* and the court finds that the provisions of the due process clause more properly address the deprivation of life complained of here. Defendants' motion for summary judgment is therefore granted on the first, fourth, and fifth amendment claims.

*C. Claims under 42 U.S.C. §§ 1985–1986*

Plaintiffs have alleged that defendants violated 42 U.S.C. §§ 1985 and 1986. Although plaintiffs do not specify which subsection of § 1985 is applicable, § 1985(3) is most on point. That subsection creates a private claim for damages for one injured in person or property or deprived of rights or privileges of citizenship by an unlawful conspiracy to deprive him or her of equal protection or privileges and immunities of the laws. Section 1986 creates a private damages claim against one who knowingly fails to prevent the wrongful conduct made unlawful by § 1985.

In order to state a claim under § 1985(3), plaintiffs must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Defendants argue that no such discrimination is alleged here, while plaintiffs point out that because John was a severely retarded citizen, "[t]he Court may well find that in such capacity, he was a member of a class sufficient to satisfy the requirement of a class-based discriminatory animus." (Plaintiffs' Memorandum in Response, *supra,* at 47.)

The Seventh Circuit has not determined whether animus against other than racial classes is actionable under § 1985(3), *Askew v. Bloemker,* 548 F.2d 673, 678 (7th Cir.1976); *Murphy v. Mount Carmel High School,* 543 F.2d 1189, 1192 & n. 1 (7th Cir.1976), although in those cases it has suggested that classes based on ethnic origin, sex, religion, or political loyalty may be actionable thereunder. Recently, however, the Seventh Circuit has ruled that § 1985(3) does not create a claim on behalf of handicapped individuals. *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474, 1486–87 (7th Cir.1985). To the extent *D'Amato* suggests that § 1985(3) protects classes of the type protected by the federal equal protection clause, 760 F.2d at 1486, it is noteworthy that the Supreme Court has recently found that legislation concerning mentally retarded individuals is not entitled under that clause to "a more exacting standard of review than is normally accorded economic or social legislation." *City of Cleburne v. Cleburne Living Center, Inc.,* — U.S. ——, 105 S.Ct. 3249, 3256, 87 L.Ed. 2d 313 (1985).

These cases persuade the court that plaintiffs have not stated a claim under § 1985(3). Defendants argue further that even were mentally retarded persons

protected by this subsection, the claims would have to be dismissed. Specifically, defendants contend that plaintiffs cannot demonstrate an intent to deprive John of his rights because of his handicap. Defendants are correct, and plaintiffs do not dispute, that because § 1985(3) requires a conspiracy, a claim thereunder must include allegations of an intent and agreement to deprive the claimant of equal protection or privileges and immunities of laws. *See Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) (elements of civil conspiracy); *Munson v. Friske,* 754 F.2d 683, 694 (7th Cir.1985) (elements of § 1985(3) claim). Defendants argue that all of the WDC residents were mentally retarded individuals, and hence it is "inconceivable" that those who would voluntarily accept employment at the facility would conspire to deprive a resident of rights because of his mental retardation. (Defendant's Memorandum in Reply, *supra,* at 19–20.)

While the court concedes that such a claim would be difficult to prove, it is not inconceivable that defendants' treatment of John was determined in part by their knowledge that as a nonverbal, mentally retarded individual, he was defenseless or deserving only of sub-standard care. Because plaintiffs have otherwise failed to state a claim under § 1985(3), however, the court need not address the sufficiency of the evidence and allegations to state such actionable misconduct. Defendants' motion for summary judgment addressed to the § 1985(3) claim is granted.

Defendants' motion for summary judgment on the § 1986 claim must be granted as well. A review of § 1986 quickly confirms the wisdom of the Seventh Circuit's concise holding that, where plaintiffs had failed to state a claim under § 1985, "[i]t is equally clear that [they] have no cause of action under 42 U.S.C. § 1986, since that section merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985." *Williams v. St. Joseph Hospital,* 629 F.2d 448, 452 (7th Cir.1980). *See also Doyle v. Unicare Health Services, Inc.,* 399 F.Supp.

69, 75–76 (N.D.Ill.1975), *aff'd,* 541 F.2d 283 (7th Cir.1976).

## D. *Claims for Violation of Due Process*

### 1. Procedural Due Process.

The plaintiffs argue that defendants violated their son's rights to both procedural and substantive due process under the fourteenth amendment. The Supreme Court addressed the elements necessary to state a claim for deprivation of procedural due process in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Drawing from the amendment's commandment—"nor shall any State deprive any person of life, liberty, or property, without due process of law"—the Court indicated that a private claim thereunder must involve a protectible interest and the deprivation of that interest ("even though negligently caused") by a state actor. *Id.* at 536–37, 101 S.Ct. at 1913–14. It is clear, and defendants admit, that John was deprived of his life while in defendants' actual or constructive custody without the benefit of a hearing. (Defendants' Memorandum in Support, *supra,* at 1.) They also admit that at the relevant times they were acting under color of state law. (*Id.*) However, they contend that plaintiffs' procedural due process claim must fail because a state-created wrongful death action provides the requisite "due process." *Parratt,* 451 U.S. at 540–43, 101 S.Ct. at 1915–17; *see* Illinois Wrongful Death Act, Ill. Rev.Stat. ch. 70, ¶ 2.

■ In *Parratt,* the plaintiff, a prison inmate, sued prison officials for their negligent loss of a hobby kit that he had ordered, alleging deprivation of property under color of state law without due process. The Court quickly recognized that a deprivation of property had been accomplished under color of state law, and proceeded to address the question whether the deprivation occurred without due process. While noting that in many cases due process requires predeprivation hearings, the Court pointed to several cases in which postdepri-

vation process satisfied the requirements of the fourteenth amendment:

> These cases recognized that either the necessity of quick action by the State or the impracticability of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.

*Id.* at 539, 101 S.Ct. at 1915 (footnote omitted). It cannot be disputed that a hearing need not always precede the "initial deprivation" in order to satisfy the due process clause. *Id.* at 540, 101 S.Ct. at 1915.

The cases cited by the Court in support of the proposition that postdeprivation hearings may satisfy due process involved deprivations of protectible interests accomplished under established state procedures. The Court next found these cases "applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee," explaining that:

> In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property ... is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation.

*Id.* at 541, 101 S.Ct. at 1916. Because the prisoner in *Parratt* could recover the value of his hobby kit in a state-created tort suit, the Court concluded that this postdeprivation remedy satisfied the requirements of the due process clause. *Id.* at 543, 101 S.Ct. at 1916. *See also, Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3203–04, 82 L.Ed.2d 393 (1984) (*Parratt* applicable to intentional deprivations of property as well).

Plaintiffs contend that the *Parratt* analysis should not be applied to a case involving the intentional deprivation of life or liberty. *See Parratt,* 451 U.S. at 545, 101 S.Ct. at 1918 (Blackmun, J., concurring). This court recently described the Seventh Circuit's application of *Parratt v. Taylor* in *LeCuyer v. Weidenbach, et al.,* 613 F.Supp. 509, 512–13 (N.D.Ill.1985) (recently released for publication). There, the court noted that the Seventh Circuit has applied the logic of *Parratt* to cases involving deprivation of liberty interests, finding that postdeprivation process in such cases sufficiently satisfies the due process clause. *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1147 (7th Cir.), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983) (negligent deprivation of life); *Ellis v. Hamilton,* 669 F.2d 510, 515 (7th Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (intentional deprivation of liberty interests in adoption proceedings); *see Bell v. City of Milwaukee,* 746 F.2d 1205, 1238 n. 39 (7th Cir.1984) ("*Parratt* has been applied to deprivations of life and liberty as well as property...."). *But see Jackson v. City of Joliet,* 715 F.2d 1200, 1202 (7th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984) (dictum that intentional deprivation of life by a state official would deprive plaintiffs' decedents of their lives without due process of law). Hence, the case law in this circuit establishes that the mere fact that a liberty interest is the subject of the procedural due process claim does not render *Parratt* inapplicable.

Plaintiffs argue additionally that *Parratt* cannot be applied to *intentional* deprivations of liberty. However, the *Parratt* holding—which was based on the impracticability or impossibility of predeprivation process—applies as well to intentional deprivations of liberty. Defendants simply had no right, under any circumstances except perhaps self-defense, intentionally to deprive John Kolpak of his life; no procedures could have justified that taking. The notion that defendants should have con-

vened a hearing before allowing John to be beaten to death simply makes no sense.

In *LeCuyer*, this court explained:

[A]ny rigid distinction between "liberty" and "property," like that between negligent and intentional deprivations, is meaningless insofar as the practicability of affording predeprivation process is concerned. It would be anomalous, for example, to uphold a § 1983 claim for a state-caused automobile collision simply because the accident resulted in death or personal injury as opposed to mere property damages. The state can no more anticipate and control random and unauthorized deprivations of liberty than it can anticipate similarly unauthorized property deprivations. The difference in injury is entirely unforeseen, and therefore irrelevant in determining the degree of procedural protections constitutionally required.

*LeCuyer, supra,* 613 F.2d at 512. The court is persuaded that the analysis of *Parratt* applies to cases of random and unauthorized violations, whether intentional or negligent, of both liberty and property interests for purposes of procedural due process claims. Because John's death was caused by such an unauthorized act, and because plaintiffs agree that they have a remedy under the Illinois Wrongful Death Act, defendants' motion for summary judgment is granted as to the procedural due process claim.

This holding does not entirely dispose of plaintiffs' due process claim, however. It is well established that *Parratt* does not apply to violations of substantive constitutional guarantees. *Bell,* 746 F.2d at 1239 n. 39; *Guenther v. Holmgreen,* 738 F.2d 879, 882 (7th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985); *Camic,* 712 F.2d at 1147 n. 5; *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 871–72 (7th Cir.1983). Under certain circumstances, intentional violations of liberty interests may violate the substantive due process rights for which the availability of post-deprivation process is no defense. *See*

*Begg v. Moffitt,* 555 F.Supp. 1344, 1362 & n. 58 (N.D.Ill.1983).

Plaintiffs appear to cite *Anton v. Lehpamer,* 584 F.Supp. 1382 (N.D.Ill.1984), for the proposition that defendants' conduct in this case violated their procedural due process rights. *Anton* involved an intentional deprivation of liberty rights, namely, the excessive use of force by police officers. There, the court examined the tension between *Parratt's* postdeprivation remedy analysis and the line of Supreme Court cases establishing the § 1983's "under color" of state law requirement did not limit the federal remedy to conduct that could not be redressed under state law. *Id.* at 1385–1386. *See United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The court concluded that it would not read *Parratt* to overrule a long line of cases "that have so long been viewed as the central focus of Section 1983," which it described generally as cases involving intentional deprivations of life or liberty and specifically as cases involving police officers' excessive use of force. 584 F.Supp. at 1385–86. While the language in *Anton* is somewhat confusing as to whether plaintiffs' claim was allowed to go forward as a substantive or procedural due process claim, this court reads the case as finding *Parratt* inapplicable because the allegations stated a substantive due process violation. *See Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (police officers' excessive use of force as fourteenth amendment violation); *Blake v. Katter,* 693 F.2d 677, 682 (7th Cir.1982) (same).

2. Substantive Due Process.

*Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), involved the substantive due process rights of residents of state-run mental institutions. In *Youngberg,* the resident asserted fourteenth amendment rights to safe condi-

tions, freedom from bodily restraint, and minimally adequate "habilitation." *Id.* at 315–17, 102 S.Ct. at 2457–59. Regarding the first right, which is the one implicated in this case, the Court adopted the test proposed by Chief Judge Seitz in concurrence with the decision below. Judge Seitz wrote that, "the Constitution only requires that the courts make certain that professional judgment was in fact exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 331, 102 S.Ct. at 2466 (citing *Romeo v. Youngberg,* 644 F.2d 147, 148 (3d Cir.1980)). The Court further explained:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. [Citation omitted.] At the same time, this standard is lower than the "compelling" or "substantial" necessity tests [the lower court opinion] would require a State to meet to justify use of restraints or conditions of less than absolute safety. We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents.

457 U.S. at 321–22, 102 S.Ct. at 2461.

The Court then considered the issue of minimally adequate treatment, finding as well that "reasonable" treatment must be determined in deference to "the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. at 2461. Decisions made by professionals, the Court continues, are "presumptively valid," with liability imposed only "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 322–23, 102 S.Ct. at 2461–62 (footnotes omitted). The Court noted:

> By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

*Id.* at 322 n. 30, 102 S.Ct. at 2462 n. 30.

 Defendants argue that *Youngberg* does not support plaintiffs. First, defendants assert that *Youngberg,* involving an "involuntary" admission to the state institution, is distinguishable from this case involving a "voluntary" admission. Defendants continue that as a voluntary resident, John did not have substantive due process rights. On the present record, this argument must fail.

The Court notes first that defendants' argument on the distinction between voluntary and involuntary admissions was raised in their reply memorandum, and hence plaintiffs have not been able to respond to it. Second, defendants merely state in their memorandum that John was admitted to the WDC under the "Voluntary Admission of Adults" provision of the Mental Health and Developmental Disabilities Code, Ill.Rev.Stat. ch. 91½, ¶ 3–400. (Defendants' Memorandum in Reply, *supra,* at 6.) This statement, however, is not evidence, and cannot be accepted as such on this motion for summary judgment. Fed. R.Civ.P. 56(e). (Plaintiff's amended complaint does not make clear the procedures under which John was admitted to the WDC.) The court notes additionally that the voluntary admission provisions to which defendants allude do not appear to be applicable to John, since they require application to the facility by the patient or an interested person on the patient's request. *Id.* at ¶ 3–401(a)(1) & (2). The ex-

tent of John's disability may have rendered him incapable of exercising such discretion; no evidence on this point is presented by either side.

It should be further noted that when confronted with this very argument, courts have consistently rejected it as a basis for determining the scope of residents' constitutional rights to a safe environment. Of course, the definitions of "voluntary" and "involuntary" vary throughout the cases; most often they are left undefined. Defendants stress John's alleged ability to leave the WDC at any time under ¶ 3–403. However, other courts have examined admission procedures as the constitutionally significant aspect of voluntariness. For example, the court in *Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 484–85 (D.N.D.1981), *aff'd in part, remanded in part on other grounds,* 713 F.2d 1384 (8th Cir.1983), found that residents who were institutionalized by their parents or guardians would not be considered voluntary admittees for purposes of defendants' argument that voluntary admittees had few or no constitutional rights. The same perception that a parent's application effects an involuntary admission swayed the court in *New York State Association for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 762 (E.D.N.Y.1973), in its decision to treat involuntary and voluntary admittees equally under the federal constitution. *See also New York State Association for Retarded Children, Inc. v. Carey,* 393 F.Supp. 715, 718 (E.D.N.Y.1975). To this end, it is significant that the plaintiff in *Youngberg* was committed upon his mother's application. 457 U.S. at 309–10, 102 S.Ct. at 2454–55. In *Spence v. Staras,* 507 F.2d 554, 557 (7th Cir.1974), the Seventh Circuit found that a resident had substantive due process rights to a safe environment without even discussing the issue of voluntary versus involuntary status, although it is noteworthy that the resident had an extant parent.

The inquiry is not ended, moreover, even if defendants are right that John's alleged right to leave at any time technically rendered him a voluntary resident. It is certainly possible that a patient with John's disabilities and his trouble communicating had virtually no power to leave or otherwise to protect himself; he may well have had only a *de jure,* and not a *de facto,* right to leave.

In any case, while the court need not consider the constitutional significance of a voluntary admission on this motion, there is much logic in the cases that find voluntary and involuntary residents entitled to the same constitutional rights to a safe environment. *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1246 (2d Cir.1984); *Harper v. Cserr,* 544 F.2d 1121, 1123 (1st Cir.1976) (would not consider as voluntary a patient who is helpless or confined *de facto* involuntarily; voluntary patient did not, however, have same right to *treatment* as involuntary patient); *Goodman v. Parwatikar,* 570 F.2d 801, 804 (8th Cir.1978) (voluntary and involuntary admittees had same constitutional rights to "safe and human environment"); *Association for Retarded Citizens of North Dakota,* 561 F.Supp. at 485 (voluntary admittee retains constitutional right to "reasonably safe" environment); *Seide v. Prevost,* 536 F.Supp. 1121, 1136 (S.D.N.Y.1982) ("I conclude that the classification of admitted patients is a distinction without a difference in the determination of patients' rights to life and to personal liberty, and concomitantly to treatment."); *Naughton v. Bevilacqua,* 458 F.Supp. 610, 617–18 (D.R.I.1978), *aff'd,* 605 F.2d 586 (1st Cir.1979) (relatively helpless, voluntary admittee has constitutional right to "safe and humane environment"). *Cf. Phillips v. Thompson,* 715 F.2d 365, 367 (7th Cir.1983) (does not decide whether voluntariness affects scope of constitutional rights of residents). One court has even determined that any distinction between voluntary and involuntary admittees would independently violate the federal equal protection clause. *Seide v. Prevost,* 536 F.Supp. at 1136.

These cases recognize that for all practical purposes, many of the residents of state-run mental institutions are effectively

admitted involuntarily: they may have been admitted upon the unilateral application of their parents or guardians; they may be incapable of expressing a desire to enter or to leave; they may be involuntarily committed when they apply for discharge; or their financial circumstances may be such that admission, voluntary or involuntary, is a foregone conclusion. A decision that a "voluntary" admittee, whatever the definition of voluntary, has no constitutional rights would have to be made with these factors in mind.

Drawing the reasonable inferences in favor of the plaintiffs, as it must on this motion for summary judgment, the court construes John's admission to the WDC as "involuntary" such that the full protections of *Youngberg* are applicable. This obviates a ruling on whether a certain degree of voluntariness in admission or discharge procedures affects the scope of an admittee's constitutional rights to safety. Under *Youngberg*, there is no question that Larry Sims violated John Kolpak's constitutional rights by beating him to death sometime between July 17 and 18, 1981. The question before the court is the liability of the remaining nine defendants.

The remaining defendants have denied beating John, and hence their liability must rest on their constitutional duties to prevent the fatal beating. Defendants argue that their treatment of John at most constitutes negligence. In addition, they characterize that treatment as having been conducted in accordance with their professional judgment, which under *Youngberg* should be accorded great deference.

The court doubts whether decisions concerning the maintenance of a safe environment are entitled to the same degree of deference as decisions regarding treatment. As the Third Circuit held in *Youngberg*, the right to personal security and protection is an "undiluted legal concern[ ], relating to protected liberty interests; as such [it is] entitled to heightened judicial scrutiny," while questions of treatment are "mixed questions of law and medical judgment, [requiring] a more flexible standard

of judicial review and suitable deference to informed medical opinion." 644 F.2d at 159. The Supreme Court may have recognized this distinction by discussing deference to professional decisions on treatment separately from its discussion of professional decisions regarding safety. 457 U.S. at 321–23, 102 S.Ct. at 2461–62.

Whether *Youngberg* rejected this analysis by the Third Circuit, however, need not be decided now, since defendants have offered no evidence of the exercise of professional judgment in John's case. First, there has been no evidence of the qualification of any of defendants as professional administrators, therapists, or medical personnel; the court will not accept the fact that defendants made decisions as IDMHDD employees alone as proof that they were competent to make decisions regarding the proper course of conduct for prevention of John's injuries.

Second, defendants have not established that professional judgment was exercised in this case. The testimony by Day and Hudson on the institution of special body checks is, to say the least, sparse. Evidence is lacking as to whether the decision was based on minimally adequate professional standards and why the decision should be considered an adequate response to the injuries. Such evidence is important, given the wisdom of such a recommendation under circumstances, suggested by the evidence, that (1) the staff might not faithfully carry out the order, (2) the staff had no expertise in identifying injuries, and (3) the staff was failing to notice injuries and to document those injuries that were noticed. The second factor makes the role of the Home Manager's and technicians' supervisors very important in determining the source of John's injuries. The third factor calls into question the wisdom of seeking the source of the injuries through a process of documentation that may be shown at trial to be unreliable. It may be that professional standards require, in a case of suspected abuse, that the injured party be removed from potential sources of abuse, rather than left in the possibly abu-

sive situation as part of a continuing experiment to identify the source. These questions remain unaddressed in defendants' motion for summary judgment, and thus the court cannot grant defendants the deference that they request the court accord their decisions regarding John's safety.

■ Defendants also contend that their conduct at most constituted negligence. At least as far as Sims' supervisors are concerned, negligence proximately causing the subordinate's wrongdoing probably states a claim under § 1983. *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391 (7th Cir.1984). In any case, the Seventh Circuit has explained that characterizing behavior as negligent, reckless, or intentional is frequently unhelpful in determining whether a constitutional violation has occurred. *Spence*, 507 F.2d at 556 n. 1; *Camic*, 712 F.2d at 1144 n. 1.

■ In *Spence*, the court upheld a substantive due process complaint in which it was alleged that defendants knew the decedent was the target of assaults, knew he had been assaulted, knew that he was helpless and nonverbal, and yet failed to protect him against the fatal attack. *Spence*, 507 F.2d at 557. The type of inaction in this case is similar to that of *Spence*. The evidence tends to show that in the first few weeks of John's stay at the WDC, he had sustained several documented injuries. (More injuries may not have been noticed or documented.) Defendants contend these injuries were trivial, but again, fail to present evidence on that point. The evidence further suggests that resident assaults were frequent, technician stress was high, and Home 9 technicians had been negligent in other respects. Certainly, this record could establish that John may have been abused; defendant Hudson testified that John's case was "extremely unusual." There is no dispute that John was nonverbal and could not help indicate the source of his injuries. Without more evidence on the nature of the injuries and the professional adequacy of defendants' response thereto, the court cannot determine that those responsible for John's safety did not violate his constitutional rights even if a

recklessness standard is appropriate. In addition, defendants do not expressly raise or argue in this motion the availability of the affirmative defense of qualified immunity, which is available to them as state executive officials. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court will therefore not address this defense on the present motion.

■ The next question posed is which defendants were responsible for John's safety and in a position to take measures to prevent future assault. The evidence indicates that Bell and Day were directly involved in reviewing incident and injury reports. Moreover, their importance in determining appropriate responses to problems is suggested by evidence tending to show that the Home Managers and technicians had no training in detecting abuse or determining the source of injuries. The Home Manager, shift leader, and technicians were also responsible for John's safety. As discussed above, these defendants have not adduced sufficient evidence of their lack of culpability to justify granting their motions for summary judgment. Because of this absence of evidence, it is not necessary for plaintiffs to present evidence tending to establish their culpability. (Of course, at trial the burden is the plaintiffs'.)

■ Defendants have presented unrebutted evidence that program coordinator John Miller had no contact with or responsibility for John. Similarly, the unrebutted evidence is that Wolochak's contact with John was at the admission level; he was not in a position to treat or supervise John. Summary judgment as to Miller and Wolochak must therefore be granted.

Regarding Canty, the defendants have presented unrebutted evidence that her exercise of medical judgment on the morning of July 18, 1981 did not cause John's death, and this fact must be taken as established at trial. However, there is evidence that her position as a WDC nurse included care for injuries. Absent evidence that her duties did not include formulation of responses to suspected abuse and general

protection of resident safety and health, the court cannot grant her motion for summary judgment regarding any liability she may have for omissions proximately causing the fatal beating.

### Conclusion

Defendants' motion for summary judgment is granted in part and denied in part. The motion is granted in full as to claims against defendants Wolochak and Miller, claims against all defendants in their official capacities, claims predicated on violations of 42 U.S.C. §§ 1985 and 1986, and claims brought under the first, fourth, and fifth amendments, as well as the procedural due process clause of the fourteenth amendment. The motion is denied as to the substantive due process claim against all defendants in their individual capacities except Wolochak and Miller. The prayer for declaratory relief is stricken. Because a federal constitutional claim remains in this case, the court will continue to exercise its pendent jurisdiction over the state law claims.

It is so ordered.