**Gerry TRAUTZ, Floyd Rhein, individually and on behalf of all others similarly situated, and Disability Advocates, Inc., Plaintiffs,**

v.

**Leon WEISMAN, Mollie Weisman, Eugene Weisman, Kones Paramananthan, Weisman's Rockland Manor—A Home For Adults, Weisman's Rest Hotel, Inc. and Its Proprietors, Agents, Servants, and/or Employees, Defendants.**

No. 92 Civ. 0534 (GLG).

United States District Court, S.D. New York.

April 6, 1993.

Disability Advocates, Inc., Albany, NY (Timothy A. Clune, Cailie Currin, of counsel), for plaintiffs.

Brody & Fabiani, New York City (Adam Simms, of counsel), for Defendants.

## OPINION

GOETTEL, District Judge.

Plaintiffs Gerry Trautz and Floyd Rhein were formerly residents of an adult care facility located in Spring Valley, New York. On behalf of themselves and a purported class of residents, plaintiffs challenge the operation of the adult home as a long-standing venture that has illegally subjected its residents to dangerous, degrading conditions while bilking them of their money.

## I. FACTUAL BACKGROUND

This action arises out of allegedly deplorable conditions which exist at Weisman's Rockland Manor (the "Manor"), an adult care facility regulated by the state which provides long-term residential care to mentally and emotionally disturbed people. The Manor is actually a partnership comprised of defendants Eugene Weisman, Leon Weisman and Mollie Weisman. The partnership leases the property used by the Manor from Weisman's Rest Hotel, a corporation. The Weismans are alleged to be owners, operators and administrators of the adult home; defendant Kones Paramananthan manages the home as an employee of the partnership.

The individual defendants have been licensed to operate the Rockland Manor for at least twenty years. According to the amended complaint, since 1972 Rockland Manor has been cited by the Department of Social Services ("DSS"), a state agency charged with the regulation of adult homes, for countless violations of state regulations. These violations cover areas such as admission standards, resident protection, food service, resident services, and environmental standards.

The Manor serves various individuals including former residents of county and state-run psychiatric facilities, homeless persons, and private citizens who arrive on their own accord. Defendants describe the Manor as a sort of half-way house for mentally and emotionally disturbed people. Approximately half of its residents are dischargees from the nearby Rockland County Psychiatric Hospital. The Manor charges its residents a monthly rent of $732 for room and board. Many of its residents receive financial assistance from state and/or federal programs in the form of Supplemental Social Security Income ("SSI").

Plaintiffs' complaints about the standard of services provided by Rockland Manor are extensive. A mere sampling of the allegations in the complaint describes a dirty, poorly operated facility with little regard for the care of the adults who live there because they are incapable of caring for themselves. For example, general allegations in the complaint are that, among other things, the defendants fail to provide adequate meals, that food is improperly stored, that the facility is in a deplorable state of disrepair, and that staff, insufficient in number, is inadequately trained. In addition, the plaintiffs claim that illegal drug transactions take place at the facility and that crack vials routinely litter the floors there.

Trautz asserts that he was a resident of Rockland Manor from November 1989 until July 1990. While he was there, he claims that his living conditions bordered on the inhumane. Plaintiffs describe the Manor as a place thoroughly infested with all varieties of vermin, rife with theft, and littered with every sort of filth imaginable. Other allegations involve the lack of security, the lack of privacy, inadequate heating and food, and the presence of drugs and prostitutes in the facility. Floyd Rhein, the other named plaintiff, claims that he lived at Rockland Manor for roughly five years and experienced similar conditions. In sum, plaintiffs allege unsanitary conditions at the Manor which more closely resemble a tenement than a habitable adult care facility.

The original complaint, brought by the proposed class representatives and Disability Advocates, Inc., a not-for-profit corporation which provides advocacy and legal representation to people with a diagnosis of mental illness, asserted a variety of federal and state causes of action. On December 11, 1992, this court denied defendants' motion to dismiss the federal claims for violations of the Rehabilitation Act and 42 U.S.C. § 1983. We granted dismissal of all of plaintiffs' claims under the Racketeering Influenced and Corrupt Organization Act of 1970 ("RICO"), 18 U.S.C. §§ 1964(a)–(d) and 42 U.S.C. § 1985(3) holding that plaintiffs failed to properly plead two predicate acts.

Plaintiffs filed an amended complaint on January 5, 1993 in which they replead their cause of actions pursuant to 18 U.S.C. §§ 1962(b)–(d). As before, plaintiffs allege numerous acts of mail and wire fraud as the underlying predicate acts of racketeering.

Before the court today is the defendants' motion to dismiss the RICO claims in plaintiffs' amended complaint. Defendants concede that the alleged acts of mail and wire fraud have been pled with sufficient particularity pursuant to Fed.R.Civ.P. 9(b).[1] Instead, they make three primary arguments: (1) plaintiffs' RICO claims must again fail because they have not adequately pled a proximate cause between the fraud committed on the federal and state governments and the injuries to the plaintiff residents of the Manor; (2) plaintiffs continue to improperly confuse the Manor as a RICO person and an enterprise under 18 U.S.C. § 1962(c); and (3) plaintiffs have not properly alleged that each defendant agreed to participate in a conspiracy under 18 U.S.C. § 1962(d) and 42 U.S.C. § 1985(3). At bottom, defendants contend that plaintiff's action sounds in contract, not racketeering fraud.

## II. DISCUSSION

It is commonly known that a court can only dismiss a complaint where "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Branum v. Clark*, 927 F.2d 698 (2d Cir.1991). In deciding a motion to dismiss under Fed.R.Civ.P. 12(Bb)(6), we must accept the allegations of the plaintiffs' amended complaint as true. *Corcoran v. American Plan Corp.*, 886 F.2d 16, 17 (2d Cir.1989) (citing *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972)).

### A. Proximate Cause and the Convergence Theory

Defendants' primary objection to plaintiffs' set of RICO claims is that the injuries claimed by plaintiffs were not proximately caused by the racketeering acts they allege. In essence, defendants contend that there is no convergence between the alleged fraud committed on the DSS and the alleged substandard care provided to the plaintiffs.

The predicate acts of racketeering alleged by plaintiffs are mail frauds indictable under 18 U.S.C. § 1341 (1982) and wire frauds indictable under 18 U.S.C. § 1343. The mail frauds identified in the amended complaint involve a series of written assurances mailed to DSS responding to reports of inspections issued by DSS to the Manor. According to the amended complaint, between 1985 and 1992 DSS cited over 260 violations of DSS regulations regarding the operation of adult homes. With each report of inspection, plaintiffs contend that, after consultation with defendant Paramananthan, Eugene Weisman mailed DSS either a letter assuring DSS that the necessary corrections had been made or a proposed compliance plan promising to institute the needed changes. Relying on these representations, plaintiffs claim that DSS continued to issue renewals of the Manor's operating certificate. In their amended complaint, plaintiffs allege that this stream of

---

1. In our earlier decision, we agreed with defendants that the alleged predicate acts of mail and wire fraud for the RICO claim had not been pled with sufficient particularity. *See* Memo. Dec. at 14–16. As we noted, pleading the predicate acts of fraud for a RICO claim must comply with Fed.R.Civ.P. 9(b), specifying the time, place, speaker, and content of the alleged misrepresentation must be specified. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986). The amended complaint thoroughly details the various mailings and wire transfers allegedly carried out by defendants.

written assurances from defendants was done with no intention of correcting any regulatory violations, but for the sole purpose of retaining the Manor's operating certificate. By maintaining their operating certificate through these fraudulent practices, plaintiffs contend that the defendants were able to carry out their scheme to defraud the Manor's residents into paying good money for substandard care.

■ To have standing to raise a claim under RICO, plaintiffs must show that their injuries were proximately caused by the predicate acts committed by the defendants. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985). The key issue raised by defendants is whether the scheme outlined above satisfies the proximate cause test for RICO claims. Defendants take the position that there is no proximate cause between the fraud committed against DSS and the horrendous living conditions plaintiffs were allegedly subjected to. Defendants contend that RICO requires a convergence or causal connection between the deceived and the injured.

The genesis of the convergence theory, in this Circuit at least, rests in dicta from the Second Circuit's decision in *United States v. Evans*, 844 F.2d 36 (2d Cir.1988). In *Evans*, the court interpreting the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), stated:

> as we read *McNally*, the Supreme Court did not focus on whether the person deceived also had to lose money or property. Nonetheless, this may be the correct view of the statute. If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property.

*Id.* at 39. The court in *Evans*, however, concluded that "the case before us today does not require us to decide this general question." *Id.* at 40.

■ After surveying the caselaw, it seems clear that the question of whether the mail or wire fraud statutes, and by extension RICO, require that the party deceived also be the party injured remains unsettled in this circuit. In our research we have found no cases which hold that a convergence of the deceived and injured is required to demonstrate proximate causation for a RICO claim.

The Second Circuit in *Corcoran*, 886 F.2d 16, following its earlier decision in *Evans* found it unnecessary to reach the issue. *Id.* at 20. Instead, the *Corcoran* court affirmed the dismissal of the mail fraud claims after concluding that the governmental regulator who received false reports had no property interest at stake; he was deceived only in his role as regulator. *See id.* at 20–21.

Most recently, the Second Circuit in *United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993), again expressed no opinion on whether the convergence theory is applicable to allegations of mail fraud. *See id.* at 253. The court simply recognized that a split currently exists amongst the federal district courts. *See.id.* at n. 2.

Following other decisions in this district, we decline to read a convergence theory into the RICO statute. RICO requires that a claimant's injuries be proximately caused by the conduct constituting the RICO violation. Section 1964(c) of RICO provides for civil remedies and states, "Any person injured * * * *by reason of* a violation of section 1962" may bring an action to recover damages. 18 U.S.C. § 1964(c) (1984). This language imposes a causation requirement on a plaintiff seeking to sue under RICO. *Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 972 (S.D.N.Y.1989) (citing *Sperber v. Boesky*, 849 F.2d 60, 64 (2d Cir.1988)). In other words, proximate cause, not convergence, is the operable test.

■ Plaintiffs allege that they have been injured by the inadequate living conditions and services offered by defendants at the Manor as well as the loss of their payments drawn from their SSI funds. We do not view as too attenuated the causal link between the fraudulent communications to DSS that were essential to securing renewals of the Manor's operating certificate and the collection of ele-

vated charges in return for the continued provision of substandard services.

As the court in *Shaw v. Rolex Watch* concluded, "The dicta in *Evans* and *Corcoran* should not be extended to deny recovery to a plaintiff who was proximately injured by defendants' deception of a third party. A more logical reading of that language is merely that a plaintiff who has not suffered an injury recognized by the mail fraud statute lacks standing." *Shaw,* 726 F.Supp. at 973.

The fraudulent scheme alleged by plaintiffs seems fairly straightforward. As averred in the amended complaint, defendants defrauded the Manor's residents by charging them the maximum allowable charge for adult home services while providing inadequate services. To carry out the alleged scheme, defendants must accomplish two things: to retain a valid operating certificate and to secure the money from the Manor's residents. According to the complaint, renewals of the operating certificate were secured through mail frauds; the money was secured through wire frauds.

By maintaining the Manor's status as a DSS-certified Adult Care Facility, its residents qualified for an elevated level of SSI. According to plaintiffs, eligible residents in a certified facility would receive from the state and federal governments a total of $827 per month as SSI. The Manor charged its residents $733 per month, the maximum allowable charge after setting aside the minimum required Personal Needs Allowance from their SSI benefits. Without a valid operating certificate, the residents' SSI benefits would be lower as would the rates they could be charged for their adult home care. Maintaining the Manor's DSS certification and therefore maintaining the $733 per month charge, say plaintiffs, was the reason for the series of fraudulent communications mailed to DSS.

Plaintiffs also allege that wire frauds were an integral part of defendants scheme; they were the means for procuring the residents' SSI money. Basically, plaintiffs claim that their SSI checks were electronically deposited directly into the Manor's accounts. Additionally, plaintiffs allege that defendants fraudulently accepted SSI funds by inter-

state wire transfer for services rendered to two individuals who did not reside at the Manor. On at least one occasion, plaintiffs also contend that defendants cashed plaintiff Trautz's $150 tax refund. In short, they maintain that bilking the Manor's residents and the government out of their SSI payments was central to the fraud scheme. Given these factual allegations, we cannot conclude that plaintiffs can prove no set of facts that would support a finding of a proximate causal connection between the mail and wire frauds and the injuries alleged by the plaintiffs.

The state laws that regulate adult care facilities such as the Manor do so for the benefit of the general public, and the residents of such facilities in particular. The DSS regulations set minimum standards for all adult care facilities. Those standards exist chiefly to protect individuals from precisely the sort of living conditions and treatment allegedly suffered by the Manor's residents. The residents of adult care facilities are unquestionably the primary beneficiaries of the DSS regulations.

Moreover, one could reasonably infer from the allegations that it was the residents of the Manor who were intended to be the ultimate targets of defendants' alleged scheme. Fraudulently securing renewals of the operating certificate was only a necessary step in eventually parting the Manor's residents from their SSI monies. As the alleged targets of the racketeering enterprise, plaintiffs may be entitled to recover for the injuries proximately, though perhaps indirectly, caused by defendants' fraud upon DSS. *See Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1286 (S.D.N.Y.1988). Consequently, plaintiffs should be permitted to prove that mail frauds allegedly perpetrated on DSS and wire frauds committed against the government enabled defendants to renew the Manor's operating certificate and continue charging plaintiffs for substandard services.

Even were we to adopt the convergence theory, which we do not, we would still decline to dismiss plaintiffs' RICO claims. In a footnote, the court in *Corcoran* took note of

the Supreme Court's decision in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), which affirmed the mail fraud convictions of a used car distributor who reset the odometers before selling its cars to retailers. When commenting on *Schmuck*, the Second Circuit observed that "[p]resumably, both the retailers and their customers who ultimately bought the cars were deceived, while in at least some cases only the customers sustained economic injury." *Corcoran*, 886 F.2d at 20 n. 5.

This observation has particular relevance to the present case. Here, one can reasonably infer from the plaintiffs' allegations that both the DSS and the Manor's residents were deceived and injured by defendants allegedly fraudulent activities. Relying upon the defendants' assurances that the violations had been corrected, or were being addressed, DSS issued renewals of the Manor's operating certificate. As a result, New York State disbursed to plaintiffs, as residents of a DSS-certified adult care facility, a greater amount of SSI funds than it would have if the Manor's operating certificate had been suspended or revoked.[2] Unlike the situation in *Corcoran* where the governmental regulator's interests were only regulatory in nature, New York has both a regulatory interest in monitoring the operations of adult care facilities within the state as well as a property interest in the amount of SSI funds it disburses to residents of such facilities.

Plaintiffs might also be considered victims of this deception who suffered tangible injuries. According to plaintiffs, not only were they deceived into believing that the Manor was a properly certified Adult Care Facility, but they were also defrauded out of an elevated amount of their SSI benefits. Plaintiffs in their amended complaint allege more than simply injury to their "intangible right"

to deal with an adult care facility that was effectively regulated by the state. *Cf. Corcoran*, 886 F.2d at 22. Even were we to agree that a convergence between the deceived and the injured is required for a RICO claim, we would conclude that plaintiffs' 'allegations' can satisfy the proximate cause requirement for their RICO claims.[3]

## B. The Person/Enterprise Distinction

█ As we noted in our earlier decision, the law in this circuit states that a corporation cannot simultaneously be a RICO "enterprise" and a RICO "person" who conducted the affairs of the enterprise. *See Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

Defendants maintain that plaintiffs' RICO claims as framed in their amended complaint suffer the same deficiency as found in the original complaint, namely that the Manor has again been identified as both the RICO enterprise and a RICO person.

We observed in our December 11, 1992 decision that plaintiffs have structured their complaint so that "the Manor is the vehicle used by defendants to engage in their fraudulent behavior." Memo. Dec. at 12–13. In ¶ 99 of their amended complaint, plaintiffs allege the RICO enterprise to be comprised of the three Weismans who form the partnership which is the Manor plus the company that owns the Manor's buildings and the Manor's manager. The Manor itself is no longer counted among the RICO persons.

It is true that plaintiffs continue to define the enterprise as an amorphous entity whose object is operating the Manor. We do not view this as fatal to the RICO pleadings. While it may have been simpler to term the enterprise as the Manor itself, the plaintiffs are not required to do so. A RICO enter-

---

2. Plaintiffs allege that because of the Manor's status as a DSS-certified Adult Care Facility, eligible resident received $405 per month from New York State and $422 per month from the federal government.

3. We also reject defendants' cursory arguments for dismissing plaintiffs' § 1962(b) claim. Defendants contend that plaintiffs have not adequately alleged any injuries resulting from the acquisition or maintenance of an interest in an

enterprise through a pattern of racketeering. *See Official Publications, Inc. v. Kable News Co., Inc.*, 775 F.Supp. 631, 635 (S.D.N.Y.1991). We cannot, however, say with any confidence that plaintiffs can prove no set of facts showing that defendants maintained their interests in the Manor and their alleged enterprise to defraud its patients through their fraudulent actions causing financial loss and physical hardship for plaintiffs.

prise can include "any individual, partnership, corporation, association, or other legal entity, and any union or group * * * associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Plaintiffs have alleged that the Weismans together with Paramananthan and the Weisman's Rest Hotel constituted such an enterprise and used the Manor as its modus operandi, its vehicle. Plaintiffs are entitled to prove that this group was "associated together for a common purpose of engaging in a course of conduct" through evidence of "an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Coffaro*, 697 F.Supp. at 1287 (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981)). The amended complaint does not blur the Manor's roles as RICO actor and RICO enterprise. The enterprise is plainly alleged by plaintiffs to be a "group * * * associated in fact although not a legal entity." *See* 18 U.S.C. § 1961(4).

This is a case where the alleged enterprise is comprised of an informal group of individuals associated for the purpose of defrauding the residents of the adult care facility run by the group. Plaintiffs seek to hold liable under RICO the people associated with this group who participated in the fraud scheme by managing and operating the Manor in a way that furthered their scheme. Thus framed, the amended complaint does not confuse the RICO persons with the alleged enterprise. *See Coffaro*, 697 F.Supp. at 1287 (quoting *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 517–18 (S.D.N.Y.1987)). The amended complaint clearly identifies the Manor as the medium for the RICO enterprise, not a RICO person. The RICO person/enterprise distinction is no grounds to dismiss plaintiff's § 1962(c) claim.

### C. The Conspiracy Claims: § 1962(d)

■ Defendants claim that plaintiffs have not adequately alleged that each defendant agreed to commit mail and/or wire frauds in furtherance of any conspiracy. Defendants recognize that the amended complaint does allege that defendants Eugene Weisman and Kones Paramananthan agreed on the contents of numerous mailings to DSS, mailings plaintiffs allege fraudulently communicated to DSS their assurances that regulatory violations were corrected. Such detailed allegations can certainly support an inference of their participation in a conspiracy to defraud DSS, and by extension the Manor's patients. Defendants correctly point out that none of these factual allegations directly link the other named defendants to the predicate acts of mail and wire fraud.

The amended complaint does allege that each defendant agreed to participate in the operation of the enterprise. Amended Complaint at ¶ 103. Without more, no inference can be drawn from such a conclusory allegation. More particularly, however, plaintiffs would seem to argue that the involvement of Leon and Mollie Weisman can be inferred from their respective positions as operators, administrators, and partners in the Manor. Similarly, they appear to argue that Weisman's Rest Hotel, as the owner/lessor of the Manor's buildings, is implicated in the conspiracy.

■ The core of a RICO civil conspiracy claim is an agreement between two or more persons to commit predicate acts of racketeering. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990). Plaintiffs need not allege that each defendant actually committed a predicate act. At minimum, however, plaintiffs' amended complaint must allege specifically an agreement. Vague, conclusory allegations standing alone are insufficient. *Id.*

Although resting on the thinnest of inferences, we agree that Leon and Mollie Weisman, as both the co-owners and operators of the Manor with Eugene Weisman, might be implicated in the conspiracy. The amended complaint alleges in conclusory fashion that the defendants conspired to conduct the Manor's affairs through a pattern of racketeering. Amended Complaint at ¶ 323. It also avers that the defendants conspired to deprive the Manor's residents of their equal protection rights. *Id.* at ¶ 326. Alone, such bare allegations would not suffice. When considered with the factual allegations regarding the Manor's management and the

specific actions of Eugene Weisman and Kones Paramanthan in renewing the operating certificate, plaintiffs' claims survive.

As the administrative team, the Weismans and defendant Paramananthan are alleged to have run the Manor. One might infer from this that the group of defendants were jointly involved in the major decisions involved in operating the Manor; communications with DSS to secure the operating license would certainly be one of them. Hence, although the factual foundations are weak at this point, we decline to dismiss plaintiffs' §§ 1962(d) claim against them.

■ However, not even the barest of inferences exists connecting defendant Weisman's Rest Hotel with the operation of the Manor. The only allegation concerning it states that it leases the buildings used by the Manor. Unlike the individual defendants, no alleged facts exist as of yet tying Weisman's Rest Hotel with the operation of the Manor. If facts develop during discovery to justify amending the complaint to replead, we shall naturally consider them. At this point, however, we grant defendants' motion to dismiss the claims under §§ 1962(d) and 1985(3) as against Weisman's Rest Hotel.

D. Section 1985(3) Claim

■ To state a claim under 42 U.S.C. § 1985(3), plaintiffs must show: (1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons to the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privileges of a citizen of the United States. *United Bhd. of Carpenters & Joiners, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983) (refusing to extend § 1985(3)'s protections to commercial and economic animus); *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).[4]

■ Plaintiffs claim that defendants conspired to deny them equal protection due to their status as a class of disabled persons residing at the Manor.[5] Section § 1985(3) clearly provides a remedy for conspiracies to deprive persons of their rights under the United States Constitution. *Traggis v. St. Barbara's Greek Orthodox Church,* 851 F.2d 584, 587 (2d Cir.1988) (citing *United Bhd. of Carpenters v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). The question is which persons or class of persons may seek such remedies.

Focusing on the second element, defendants attack plaintiffs' § 1985(3) conspiracy claim arguing that plaintiffs are not members of any protected class. Defendants correctly

---

4. Section 1985(3) provides in relevant part:

> If two or more persons in any State of Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

5. The Manor, as an adult care facility, is heavily regulated by the state and also receives a sizeable portion of its income, directly or indirectly, from *state and federal sources. At this juncture,* however, we do not decide whether the Manor and its management were acting under color of state law, or purely in their private capacities.

To prove a private conspiracy in violation of § 1985(3), plaintiffs must show, *inter alia,* (1) some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action and (2) that the conspiracy was aimed at interfering with rights that are protected against private, as well as official encroachment. *Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, ——, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993) (citing cases).

Since the focus of defendants' attack is the existence of a proper class-based animus, an element required for § 1985(3) claims against both private conspiracies and those under color of state law, any distinction between the standards for private conspiracies and conspiracies under color of state law is immaterial.

contend that to state a claim under § 1985(3), plaintiffs must allege that the conspiracy was motivated by class-based discriminatory animus. *See Bettio v. Village of Northfield*, 775 F.Supp. 1545, 1567 (N.D.Ohio 1991).

The best that can be said of § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in flux by the Supreme Court.[6] The language in § 1985(3) requiring intent to deprive a person of equal protection or equal privileges and immunities means that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798. While the Supreme Court in *Griffin* ruled that § 1985(3) applied to private conspiracies, the Court equivocated on whether it applied to non-racial classes.

Later, in *Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), the Court recognized that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans." *Id.* at 836, 103 S.Ct. at 3360. It then reaffirmed *Griffin*'s holding that "racial, or perhaps otherwise class-based, invidiously discriminatory animus" must be at work. 463 U.S. at 835, 103 S.Ct. at 3359.

The Court's holding, while certainly not definitive, left open the possibility that § 1985(3) encompasses more than simply racial animus. Using the language in *Griffin* as a jumping off point, courts have held that protection under § 1985(3) extends to the "discrete and insular" minorities who receive special protection under the equal protection clause because of inherent personal characteristics. *See Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir.1980). Some courts have interpreted it to mean that the § 1985(3) class must be a well-defined and traditionally disadvantaged group. *See Orshan v. Anker*, 489 F.Supp. 820 (E.D.N.Y.1980).

Most recently, the Supreme Court revisited § 1985(3) in *Bray v. Alexandria Women's Health Clinic*, —— U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). In that case, several abortion clinics and supporting associations sued to enjoin an association and several individuals who organized an anti-abortion demonstration, from conducting demonstrations at clinics in the Washington, D.C. metropolitan area. The Court held that opposition to abortion does not qualify as an "otherwise class-based invidiously discriminatory animus" for purposes of proving a private conspiracy in violation of § 1985(3). The Court determined that a class for purposes of § 1985(3) must be:

> something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.

*Id.* at ——, 113 S.Ct. at 759. This definitional problem does not cause any significant difficulty in the case at bar. Plaintiffs allege that their status as disabled residents of the Manor, as opposed to any particular activity they have engaged in, is the reason for defendants alleged unequal treatment. In other words, plaintiffs claim that defendants targeted them for their scheme at least in part because of their disability status.

Before turning to the specific question of whether a class of disabled individuals is cognizable under § 1985(3), we make one final point. Recognizing that the idea of equal protection is enshrined in both § 1985(3) and the fourteenth amendment, our opinion, though not expressly governed by fourteenth amendment jurisprudence, is at least informed by it. *See Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583, 593 (7th Cir.1989), *cert. denied*, 498

---

**6.** As the Seventh Circuit observed in *Stevens v. Tillman*, 855 F.2d 394 (7th Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d

809 (1989), "Changing interpretation has been the only constant about § 1985(3)." *Id.* at 405.

U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).[7]

Other courts have explicitly held that disabled individuals do not constitute a "class" within the meaning of § 1985(3). *See, e.g., D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474, 1486–87 (7th Cir.1985) ("The legislative history of Section 1985(3) does not suggest a concern for the handicapped."); *Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1176–77 (10th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984); *Downs v. Sawtelle,* 574 F.2d 1, 16 (1st Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *Miller v. City of Dixon,* 1992 WL 70340 at *5, 1992 U.S.Dist. LEXIS 4692 at *14 (W.D.Ill.1992); *Moreno v. Pennsylvania,* 1991 WL 46472 at *8, 1990 U.S.Dist. LEXIS 18606 at *23–24 (E.D.Pa. 1990); *Ahlberg v. Kansas,* 1990 WL 80925 at *3, 1990 U.S.Dist. LEXIS 7006 at *10 (D.Kan.1990); *Herhold v. City of Chicago,* 723 F.Supp. 20, 35 (N.D.Ill.1989); *Kolpak v. Bell,* 619 F.Supp. 359, 373 (N.D.Ill.1985); *Corkery v. SuperX Drugs Corp.,* 602 F.Supp. 42 (M.D.Fla.1985); *Cain v. Archdiocese of Kansas City, Kan.,* 508 F.Supp. 1021, 1027 (D.Kan.1981); *see also Story v. Green,* 978 F.2d 60, 64 (2d Cir.1992) (noting that disability has not generally been considered a suspect or quasi-suspect classification under the equal protection clause).

The court in *D'Amato,* offering a more sustained discussion of disability as a proper class within § 1985, relied upon the original intent underlying Congress' passage of § 1985 as § 2 of the "Ku Klux Klan Act of 1871" to combat the racial battles waged by against African–Americans and the Thirteenth, Fourteenth, and Fifteenth Amendments during the Reconstruction Era. *See*

*D'Amato,* 760 F.2d at 1487; *Wilhelm,* 720 F.2d at 1176; *see also Triad Associates,* 892 F.2d at 592 ("it cannot be doubted that the predominant purpose of the legislature in passing the Act was to combat the prevalent animus against Blacks and their supporters in the South during the Reconstruction Era.").

The *D'Amato* court concluded that "[b]eing handicapped is not a historically suspect class such as race, national origin, or sex." *Id.* at 1486. Underpinning this conclusion was the court's observation that:

> handicaps vary greatly from immediately noticeable physical handicaps to ones not at first obvious or those revealed only by a medical examination. Handicaps are also a condition that may be overcome, depending on the individual and on the handicap; likewise the severity with which a handicap affects a person varies from individual to individual.

*Id.*[8] Using this reasoning, the court distinguished the disabled as a potential § 1985(3) class from "classes based on race, ethnic origin, sex, religion and political loyalty that have previously been recognized as possibly supporting a Section 1985(3) claim." *Id.*

In our view, whether or not a disability is apparent to the naked eye or requires a medical examination to diagnose, it remains an inherent personal characteristic. The fact that an individual may "overcome" a disability, if able, only underscores the fact that a disability by its very nature is an immutable obstacle often created only by an accident of birth, not unlike race, gender, or national origin, which cannot be erased, but must be surmounted. *Cf. Frontiero v. Richardson,* 411 U.S. 677, 682 and 686, 93 S.Ct. 1764, 1768

---

**7.** Recently, the Supreme Court applied the discriminatory purpose criteria used for Equal Protection Clause challenges to the "class-based, invidiously discriminatory animus" requirement of § 1985(3), although it did so not because it viewed Equal Protection Clause jurisprudence as automatically incorporated into § 1985(3). *See Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, —— n. 4, 113 S.Ct. 753, 761 n. 4, 122 L.Ed.2d 34 (1993).

**8.** These comments echoed observations made in *Wilhelm v. Continental Title Co.,* 720 F.2d 1173

(10th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984), in which the court stated:

> It is apparent that different individuals are handicapped in vastly different ways, for different periods of time, and to very different degrees or extent. The variations in each category are infinite and as a consequence the term "handicapped" does not have a definition capable of a reasonably precise application for the purposes before us.

*Id.* at 1176.

and 1770, 36 L.Ed.2d 583 (1973). In *Frontiero*, the Supreme Court, holding that classifications based on gender are inherently invidious, observed that:

> sex, like race or national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate "the basic concept of our system that legal burdens should bear some relationship to individual responsibility."

*Id.* at 686, 93 S.Ct. at 1770. We think this reasoning applies with equal force to classifications based upon disability, at least where, as is frequently true, the disability has no relation to a person's ability to perform in an employment setting or contribute to society. A valid distinction might exist for cases arising in the work setting where disability is sometimes related to a person's ability to perform a given task. *Accord id.* at 682 and 686, 93 S.Ct. at 1768 and 1770; *D'Amato*, 760 F.2d at 1486–87. Such distinctions, however, have no relevance to the present case which is unrelated to the employment setting.

Significantly, the Second Circuit in *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 42–43 (2d Cir.1982), *modified on other grounds*, 718 F.2d 22 (2d Cir.1983), rejected such holdings as unconvincing, and we firmly agree. *See also Tyus v. Ohio Dept. of Youth Services*, 606 F.Supp. 239, 246–47 (S.D.Ohio 1985).

We also note that the cases which denied disabled individuals the equal protection afforded to "discrete and insular" classes under § 1985(3), with one exception, pre-dated the recent enactment of Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* (West Supp. II 1992), which became effective on January 26, 1992 and barred discrimination against individuals with disabilities in the provision of public services. All but two cases preceded the passage of the Americans With Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 327 (1990), 42 U.S.C. § 12101 *et seq.*, made effective on July 26, 1990.

In enacting the ADA, Congress explicitly found that:

> *individuals with disabilities are a discrete and insular minority* who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7) (emphasis added). To the extent that cases such as *D'Amato* rely upon conclusions that people with disabilities are not a class historically discriminated against, we think them undercut by the ADA, and history.[9]

One of Congress' avowed purposes was to "invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). Title II prohibits public entities, *see* 42 U.S.C. § 12132, and public accommodations, *see* 42 U.S.C. § 12182, from discriminating against persons by reason of their disabilities.[10]

9. At this point, we make no ruling on whether the plaintiffs, as residents of the Manor, qualify as persons with disabilities under the Americans With Disabilities Act, 42 U.S.C. § 12102(2). We note that the amended complaint alleges that plaintiff Jerry Trautz has been diagnosed with a mental illness called bi-polar mood disorder. Amended Complaint at ¶ 5. It also describes the Manor's residents as adults who are, "by reason of physical or other limitations associated with age, physical or mental disabilities ... unable or substantially unable to live independently." *Id.* at ¶ 21.

10. We do not address whether the Manor, which is heavily regulated by the state as an adult care facility and receives a large proportion of its income from the Social Security benefits of its residents, falls within the definition of a public entity under 42 U.S.C. § 12131(1). Nor do we reach any conclusions regarding its status as a public accommodation under 42 U.S.C. § 12181(7).

While not relying upon the ADA,[11] we are informed by its virtual revolution in the area of rights for the disabled and its invocation of the fourteenth amendment's guarantees of equal protection. The ADA represents a comprehensive national mandate to eliminate discrimination against individuals with disabilities. While it may not provide heightened scrutiny for discrimination against individuals with disabilities under the equal protection clause, it is relevant to Congress' interpretation of § 1985(3).

Finding that a class of disabled individuals may fall within § 1985(3)'s protective ambit does not clearly run afoul of the statute's express language or its present parameters. The statute's language does not expressly limit its application to cases of racial discrimination. We shall not graft such a limitation onto it, truncating its sweep, when comparable Reconstruction civil rights legislation such as the equal protection clause of the fourteenth amendment has no such boundaries.[12]

Race was explicitly the predominant concern of the Ku Klux Klan Act of 1871, and national origin and political loyalty arguably fall within its original orbit. However, nothing in its legislative history suggests that animus based upon gender or religion were a part of Congress' concerns. Yet, women as a class have been accorded semi-suspect class status by courts, and laws discriminating against women face a heightened scrutiny. *See Frontiero,* 411 U.S. at 682, 93 S.Ct. at 1768. As a result, gender-based discrimination has been held to be invidious class-based animus under § 1985(3). *See Life Ins. Co. of North America v. Reichardt,* 591 F.2d 499 (9th Cir.1979). So too are religious groups, *see Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir.1973), supporters of political candidates, *see Conklin v. Lovely,* 834 F.2d 543,

549 (6th Cir.1987), and political parties, *see Keating v. Carey,* 706 F.2d 377, 385–86 (2d Cir.1983), protected classes under § 1985(3).

Indeed, courts have held that § 1985(3) covers discrimination against classes other than race where courts have designated the class in question as a suspect or semi-suspect class requiring higher scrutiny, or where Congress has indicated through legislation that the class required special protection. *Planned Parenthood Ass'n v. Holy Angels Catholic Church,* 765 F.Supp. 617, 623 (N.D.Cal.1991) (citing cases). Congress in the ADA has explicitly identified people with disabilities as a discrete and insular minority. Courts have held that discrete and insular minorities are protected under § 1985(3). *See, e.g., Browder,* 630 F.2d at 1150. In order to read these two federal statutes in a consistent, harmonious fashion, individuals with disabilities would now qualify as a protected class under § 1985(3).

On the present record, we are not prepared to say that the Manor's residents, all persons who are either mentally or emotionally disturbed, or both, cannot demonstrate common characteristics or conditions of an inherent nature. To the extent that such cases as *Wilhelm* deny that disabilities can form the basis of an identifiable class because each individual's condition is unavoidably unique, we respectfully disagree. Simply because the degree of disability or its effects upon an individual may differ by individual does not mean necessarily that persons cannot conspire to deny them equal protection as a group because of their disabilities, whatever the individual differences.

The history of discrimination against individuals with disabilities, while less noted than racial or sex discrimination, is no less a story of a group that has traditionally suffered not

---

**11.** Plaintiffs have not brought a cause of action under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (West Supp. 1992). We presume that this occurred because plaintiffs' causes of action accrued before Title II of the ADA regarding the provision of public services became effective on January 26, 1992. Plaintiff Jerry Trautz was a resident of the Manor until July 1990. Plaintiff Floyd Rhein, a resident at the Manor for five years, was allegedly evicted without notice in April 1991.

**12.** Indeed, courts have noted that the equal protection clause of the fourteenth amendment has been applied to disparate treatment not only on the basis of race but of sex, alienage, disability, poverty, and corporate status to name only the more prominent areas. *See Tyus v. Ohio Dept. of Youth Services,* 606 F.Supp. 239, 246 (S.D.Ohio 1985).

only physical barriers but the badge of inferiority emplaced by a society that often shuns their presence. In passing the ADA, Congress expressly found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). The ADA's statement of purposes makes clear that it was intended to address this long-ignored problem. *See* 42 U.S.C. § 12101(b). By enacting the ADA, Congress has made clear that discrimination against individuals with disabilities must be forcibly cast aside. On balance, the immutability, historical prejudice, continued discrimination, and political invisibility endured by people with disabilities justify recognizing them as a possible class for purposes of § 1985(3).

It could be inferred that defendants made the Manor's residents the target of their alleged fraudulent scheme precisely because mentally and emotionally disturbed people, many recently discharged from mental facilities, would be ill-equipped to thwart their plans or hesitant to complain about their living conditions and treatment. Without a more developed factual record, we do not say that plaintiffs form an identifiable group of disabled residents. We simply hold that a class of individuals with disabilities may be protected by § 1985(3). We therefore deny defendants' motion to dismiss the § 1985(3) claim.

### III.  CONCLUSION

To conclude, we deny defendants' motion to dismiss, with the exception that we grant the motion to dismiss the §§ 1962(d) and 1985(3) conspiracy claims against defendant Weisman's Rest Hotel.

SO ORDERED.