**MEDGAR EVERS HOUSES TENANTS ASSOCIATION, et al., Plaintiffs,**

v.

**MEDGAR EVERS HOUSES ASSOCIATES, L.P., The United States Department of Housing and Urban Development, et al., Defendants.**

No. 97–CV–2919 (JG).

United States District Court, E.D. New York.

Oct. 23, 1998.

Naomi Schrag, Patterson Belknap Webb & Tyler LLP, New York City, Richard J. Wagner, Brooklyn Legal Services Corp., "A", Brooklyn, NY, for Plaintiffs.

Franklyn H. Snitow, Snitow & Pauley, New York City, Medgar Evers Houses Assoc., L.P., BPC Management Corp., New England Management Corp., Philip Rosen-

berg, Douglas Rosenberg, Seymour Maslow, Richard Curtis, for defendants.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY, by Richard Molot, Assistant United States Attorney, for defendant United States, Department of Housing and Urban Development.

### MEMORANDUM AND ORDER

GLEESON, District Judge.

The Medgar Evers Houses Tenants Association and 181 tenants bring this action against the Medgar Evers Houses Associates, Limited Partnership ("MEHALP"), BPC Management Corporation ("BPC"), the New England Management Company, Inc. ("New England Management"), and others, claiming violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and New York State Real Property Actions and Proceedings Law (RPAPL) Article 7A, §§ 769–78. The defendants against whom relief is sought [1] have moved to dismiss the RICO claim on the ground that it fails to state a claim upon which relief could be granted. For the reasons set forth below, defendants' motion is granted.

### FACTS

Medgar Evers Houses Tenants Association is an unincorporated association of tenants of the Medgar Evers Houses, a federally subsidized, low-income housing project consisting of nine buildings in the Bedford–Stuyvesant section of Brooklyn, New York. The individual plaintiffs are the tenants in 181 of the 315 apartment units located in the project. All of them participate in the federal program known as "Section 8" rental assistance.

Defendant MEHALP has owned the Medgar Evers Houses since 1985. Defendant BPC operated and managed the project for MEHALP from approximately 1985 to 1990.

Defendant New England Management has operated and managed the project for MEHALP since 1990. The individual defendants are employees of BPC or New England Management.

### A. *The Statutory and Regulatory Framework*

The Section 8 program helps low-income families obtain a wholesome place to live, *see* 42 U.S.C. § 1437f, furthering the National Housing Act's "goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. To achieve this goal, HUD provides, among other benefits, mortgage insurance or direct mortgages to the private sector at below-market rates for development or purchase and maintenance of low-income housing for the duration of the mortgage. Section 8 rental assistance consists of monthly rent subsidy payments to the owners of qualifying housing projects, such as Medgar Evers Houses. The government subsidizes that portion of each tenant's total contract rent that exceeds 30% of the tenant's adjusted gross income.

HUD regulates Section 8 properties pursuant to various laws and regulations as well as through a Housing Assistance Payment ("HAP") Contract and a Regulatory Agreement between HUD and the property owner, in this case, MEHALP. Through the HAP Contract and Regulatory Agreement, HUD imposes on owners of Section 8 projects the duty to provide services and maintain the premises in compliance with HUD regulations and in conformity with state and local laws.

The government pays Section 8 rent subsidies on the tenants' behalf directly to the owner upon its (or its agent's) submission of a HUD form known as a "Housing Owner's Certification and Application for Housing Assistance Payments" ("Owner's Certification"). The Owner's Certification requires the owner to sign a statement that provides, in relevant

---

1. The United States Department of Housing and Urban Development ("HUD") and the Department of Housing and Preservation Development of the City of New York ("HPD"), named in the complaint as "co-defendants," are nominal defendants. HUD holds the mortgage on the property at issue and regulates the project, and HPD

serves as the municipal agency charged with enforcement of New York City and State housing laws. Neither has taken a position on this motion. Unless otherwise noted, the term "defendants" refers only to MEHALP, BPC, New England Management, and the individual defendants.

part, that "all required inspections have been completed ... [and] the units for which assistance is billed are safe, decent and sanitary and occupied or available for occupancy." Complaint ¶ 47.

HUD retains the power and authority to replace non-performing management, to withhold subsidy payments and, if necessary, declare a default under the mortgage and regulatory agreement, and to become a "mortgagee in possession" or commence mortgage foreclosure proceedings.

### B. The Conditions at the Medgar Evers Houses

HPD serves as the New York City agency responsible for inspecting residential apartment units for violations of various housing and building safety codes. HPD generally conducts such inspections in response to tenant complaints or housing court disputes in which tenants allege conditions impairing building safety or habitability. Violations issued by HPD inspectors fall into three categories of severity. The most severe are designated "C" violations, issued for conditions that present immediate hazards to the health and/or safety of the tenants. These must be corrected within twenty-four hours. Next in severity are "B" violations, issued for hazardous conditions, which must be corrected within thirty days. The least severe are "A" violations, which cover non-hazardous conditions that must be corrected within six months. Plaintiffs allege that, as of the filing of their complaint in May 1997, a total of 1,595 housing code violations existed at Medgar Evers Houses, of which 1,188 were either "C" or "B" violations.

Between 1990 and the present, HUD has conducted at least six on-site inspections. These inspections found various types of repairs and maintenance needed in many areas, including elevators, exterior walls and foundations, water and sewage systems, insulation, electrical fixtures and systems, and heating systems. The inspectors also found a need for rodent and vermin extermination and a pervasive condition of mold and mildew throughout the project.

### C. The Plaintiffs' Claims

Although HUD is named as a "co-defendant" in the complaint, plaintiffs have conceded that it is only a nominal defendant, from which no relief is sought unless the Court orders the dissolution of the RICO "enterprise" and places the project in receivership. See Complaint ¶ 3; Transcript of Oral Argument, Jan. 9, 1998 ("Tr."), at 18–19.[2] Plaintiffs thus do not assert that federal jurisdiction arises because HUD is a party to this action. Rather, federal jurisdiction rests on their RICO claim and on supplemental jurisdiction under 28 U.S.C. § 1367. The complaint alleges that MEHALP, BPC, New England Management, and the individual defendants constituted an "associated in fact" "enterprise" within the meaning of 18 U.S.C. § 1961(4). Plaintiffs charge those defendants with violating 18 U.S.C. § 1962(c) and (d) by participating and conspiring to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity consisting of acts of mail fraud and wire fraud. Specifically, plaintiffs allege "three distinct types of mail and/or wire frauds." Complaint ¶ 45.

The first centers on the monthly Owner's Certification filed with HUD. As noted above, each such certification must contain a statement by the project owner that "all required inspections have been completed ... [and] the units for which assistance is billed are safe, decent and sanitary." Plaintiffs allege that in each Owner's Certification since December 1985, MEHALP made that statement knowing it to be false and misleading. The second type of fraud alleged in the complaint consists of statements made by MEHALP to HUD in response to its site inspection reports and management reviews conducted between 1986 and 1997. These letters, plans, and other written submissions (six are specified at Complaint ¶ 52) allegedly contained false and misleading statements to HUD regarding repairs and improve-

---

2. "Similarly, the New York City Department of Housing and Preservation Development (HPD) is named as a nominal defendant because plaintiffs also assert a supplemental State claim for the appointment of an Article 7–A Administrator...." Complaint ¶ 3.

ments to the project in order to "lull HUD into inaction." Complaint ¶ 54. The third type of fraud alleged by plaintiffs deals with monthly and annual financial reports which MEHALP submitted to HUD. These submissions allegedly contained false statements about MEHALP's costs and expenses in order "to conceal from HUD the 'diversion' and misappropriation of Project funds." Complaint ¶ 56.

Plaintiffs also allege conspiracy and substantive violations of 18 U.S.C. § 1962(b), contending that the defendants maintained their interest in, and control of, the charged enterprise through a pattern of racketeering activity. In addition to the RICO claims, plaintiffs allege violations of the New York Real Property Action and Proceedings Law based on the condition of the apartments in the project. Plaintiffs seek an order (1) dissolving the charged enterprise and placing its assets in receivership; (2) directing the defendants to divest themselves of their interest in the enterprise and in Medgar Evers Houses; and (3) enjoining the defendants from owning or managing public-assisted housing. They also seek treble damages under the RICO statute, an accounting, the appointment of an administrator under the RPAPL,[3] and attorneys' fees.

### DISCUSSION

#### A. The Standard for Dismissal Under Rule 12(b)(6)

A federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The inquiry focuses not on whether a plaintiff might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *Id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* Rule 12(b)(6) warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.*

*Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997). In addition, in ruling on defendant's motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton,* 128 F.3d at 59 (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)).

#### B. The RICO Claims

■ The RICO statute furnishes a private civil action to a person who has been "injured in his business or property by reason of a violation of" 18 U.S.C. § 1962. 18 U.S.C. § 1964(c). In order to prove a violation of § 1962, a plaintiff must prove that the defendant used money derived from a pattern of racketeering activity to invest in an enterprise, acquired control of an enterprise through a pattern of racketeering activity, or conducted the affairs of an enterprise through a pattern of racketeering activity, or conspired to do any of those things. 18 U.S.C. § 1962(a)–(d). A pattern of racketeering activity requires, *inter alia,* at least two "acts of racketeering activity." 18 U.S.C. § 1961(5). The acts of racketeering activity alleged here consist of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

#### 1. The § 1962(c) Claim

■ The Supreme Court has interpreted the "by reason of" language in § 1964(c) as requiring not only actual causation, but proximate cause as well. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). *Holmes* involved a RICO claim brought by the Securities Investor Protection Corporation ("SIPC"), a private nonprofit corporation established pursuant to a federal statute to provide financial protection to the customers of failed broker-dealers who were members of SIPC. SIPC had advanced nearly $13 mil-

---

**3.** Defendants assert that the RPAPL claim is moot in light of a Stipulation and Order dated August 11, 1997, under which HUD became the Mortgagee–In–Possession of the Medgar Evers Houses and Jeffrey Goldstein was appointed a managing agent.

lion to the customers of two such broker-dealers and brought the RICO claim against Holmes and others on the theory that their fraudulent activity had prevented the broker-dealers from satisfying their obligations to those customers, thus triggering SIPC's statutory duty to reimburse those customers. 503 U.S. at 260–64, 112 S.Ct. 1311.

In rejecting SIPC's RICO claim, the Supreme Court focused on the distinction between injuries actually caused by RICO violations and the narrower category of injuries "proximately" caused by them. The boundaries of the latter category have evolved as the result of a legal policy determination. As the Court put it, "Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Id.* at 268, 112 S.Ct. 1311 (quoting W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed.1984)). The Court concluded that in the civil RICO context, justice demands that a plaintiff demonstrate a direct relationship between the injury asserted and the RICO violation.

The Court identified several reasons for this directness requirement. First, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id.* at 269, 112 S.Ct. 1311 (citation omitted). Second, extending the private RICO claim beyond the first level of injury would "force courts to adopt complicated rules apportioning damages among plaintiffs" at different levels of injury from the acts of racketeering, in order to prevent the risk of multiple recoveries. *Id.* Finally, the Court observed, there remains little need to address these complex issues, as the ability of directly-injured victims to bring suit generally serves the deterrent purpose of the private civil action. *See id.* at 269–70, 112 S.Ct. 1311.

Guided by these concerns, first expressed in the antitrust context, the Court concluded that SIPC was not a proper RICO plaintiff.

SIPC's claim would require a determination of whether the broker-dealers' customers' losses resulted from the alleged stock manipulation "as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." *Id.* at 273, 112 S.Ct. 1311. Putting that factual causation issue aside, the conferral of a cause of action on those indirectly injured would require the apportionment of the prospective recoveries among the various plaintiffs, "who would otherwise each be entitled to recover the full treble damages." *Id.* at 259, 112 S.Ct. 1311. Finally, "the law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication." *Id.* at 273, 112 S.Ct. 1311.

■ Those concerns equally apply to this case. The various false and misleading statements that constitute the acts of racketeering activity were all made to HUD. Plaintiffs do not allege that defendants made any of the representations underlying the mail and wire fraud allegations to the plaintiffs. Indeed, plaintiffs were not even aware of the false statements; in opposing defendants' statute of limitations argument, plaintiffs assert that they did not discover the scheme to defraud HUD until the spring of 1997. Plaintiffs' Mem. at 8.

The second-level injuries plaintiffs claim to have suffered are analogous to those alleged by the SIPC in *Holmes* and would impose similar burdens on the courts. If this RICO claim proceeds, the fact-finder would be required to determine whether the complained of conditions at the Medgar Evers Houses in fact resulted from the false statements to HUD, as opposed to, for example, the defendants' poor management of the housing project. Putting that factual issue aside, permitting plaintiffs to maintain a treble damage action would seem to require an apportionment of possible recoveries among the directly defrauded party (HUD) and others indirectly injured by the fraudulent scheme, a group not necessarily limited to the plaintiff

tenants.[4] Finally, as in *Holmes*, the law need not shoulder these difficulties. HUD itself can deter fraudulent statements to HUD. Owners who make the fraudulent statements face criminal prosecution under 18 U.S.C. § 1001, *see United States v. Mandanici*, 729 F.2d 914 (2d Cir.1984), and remain subject to civil penalties and other remedies under the HUD regulations.

Plaintiffs rely on the Second Circuit's articulation of the proximate cause requirement in *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990). In that case, the court stated that the RICO pattern or act must be a "substantial factor in the sequence of responsible causation," and the injury must be "reasonably foreseeable or anticipated as a natural consequence" of the defendant's fraudulent conduct. Plaintiffs here argue that the pattern of false representations to HUD enabled the defendants to get and keep federal funds that should have been expended for plaintiffs' benefit, and thus this pattern was a "substantial factor" in a sequence of events causing foreseeable injury to them. *See* Plaintiffs' Mem. at 18–19.

I disagree. Even accepting that the defendants' fraudulent statements to HUD constituted a "but for" cause of the conditions at the Medgar Evers Houses, those conditions were neither reasonably foreseeable when the defendants made the false statements nor the natural consequence of those statements. The racketeering acts allowed the defendants to receive continued, even increased, Section 8 funding. The defendants' failure to use the money to benefit the tenants did not flow from the misrepresentations made to HUD. This failure may have been a foreseeable result of plaintiffs' generalized allegations that defendants misappropriated federal funds, but plaintiffs do not include those allegations among the racketeering acts in the RICO claim.[5]

Second, plaintiff's reliance on *Hecht* ignores the fact that *Hecht* was decided before *Holmes*. Arguably, the proximate cause standard articulated by *Hecht*, and especially its focus on the foreseeability of injury to the plaintiffs, requires some modification after *Holmes*, which focused on the directness of that injury. Indeed, it is not clear to me that the SIPC's claim in *Holmes* would have failed if the Court had applied to it the *Hecht* standard quoted above.

Although the Second Circuit has stated that "*Holmes* essentially endorsed [*Hecht's*] definition of proximate cause," *In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 399 (2d Cir.1994), a careful reading of its decisions reveals a refinement of the *Hecht* formulation of the proximate cause requirement.

In *Hecht*, the court held that the plaintiff's injuries were not reasonably foreseeable or the natural consequence of the RICO violations because the plaintiff was "neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s]." 897 F.2d at 24 (internal quotations and citations omitted). More recently, the Second Circuit has made explicit a requirement, implied in *Hecht* and *Holmes*, that in order for a plaintiff to succeed on a RICO claim, the injuries alleged must be the "preconceived purpose" or the "specifically intended consequence" of the defendants' racketeering, or else they are not the "necessary result" or "foreseeable" consequence of those actions. *In re American Express*, 39 F.3d at 400; *see also Abrahams v. Young, & Rubicam, Inc.*, 79 F.3d 234, 237 (2d Cir.1996) (holding that plaintiff failed to establish RICO claim because he was not "the target of the racketeering enterprise[,] . . . [t]hat is to say, [his] injuries did not flow from the harms that the predicate acts . . . were intended to cause" (internal quotations and

---

4. For example, a plumbing contractor with a contract to make the plumbing repairs at the project could allege that, as a result of false statements to HUD that plumbing repairs had been made, it was injured in its business, *i.e.*, but for the fraud, it would have done the repair work. Such a contractor would also face an actual causation hurdle (in the absence of the fraud, would the defendants really have used the

contractor to make the repairs?), but would be no further removed from the fraudulent conduct than the plaintiffs.

5. I do not mean to suggest that the RICO claim would survive if it had included the misappropriations as racketeering acts.

citations omitted)), *cert. denied*, —— U.S. ——, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996).

Thus, the cases in which RICO claims have failed involve racketeering acts directed at persons other than the plaintiffs. The claim in *Hecht* was brought by an employee who alleged fraudulent acts (such as forging customer signatures on orders and fabricating bills) committed by fellow employees and their agents against their customers. 897 F.2d at 22. In *Manson v. Stacescu*, 11 F.3d 1127 (2d Cir.1993), *cert. denied*, 513 U.S. 915, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994), plaintiffs charged the defendants with numerous criminal acts committed as part of a scheme to loot a company. The plaintiffs, who were shareholders or employees of the company, or guarantors of its debt, lost their RICO claim because their injuries, unlike those of the corporate victim, were indirect. *See id.* at 1132; *see also In re American Express*, 39 F.3d at 399–401 (determining that shareholder derivative RICO claim failed because corporate officers' alleged conspiracy to defame rival company involved criminal acts directed at others, not at corporation); *Abrahams*, 79 F.3d at 238 (stating that intended targets of advertising firm's illegal scheme to obtain foreign account by bribery and other illegal acts were firm's competitors, and thus intended recipient of bribes, who was injured only by fallout from scheme's disclosure, could not maintain RICO claim).

On the other hand, RICO claims survive proximate cause-based motions to dismiss when the plaintiff stands as the target of the racketeering acts. In *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 30 F.3d 289 (2d Cir.1994), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996), for instance, the plaintiff, a creditor of a corporation, brought a RICO claim against defendants who looted the corporation's assets, causing the corporation to default on his note. Although the circumstances in *GICC Capital* appear superficially similar to those in *Manson, supra,* the plaintiff in *GICC Capital* negotiated the note with the defendants while they looted the company and alleged fraudulent behavior directed at him in connection with the issuance of the note. *GICC Capital* at 292–93.

Measured against this standard, the RICO claims here fail. The alleged racketeering acts were "intended to mislead HUD," Complaint ¶ 52, "to lull HUD into inaction and induce it to forego punitive and/or remedial enforcement actions against MELHAP," Complaint ¶ 54, and "to conceal from HUD the 'diversion' and misappropriation of Project funds," Complaint ¶ 56. By plaintiffs' own formulation of their claim, HUD was the sole target of the alleged misrepresentations, and defendants induced HUD alone to part with millions of dollars. The plaintiffs were "not the intended targets of the RICO violations." *In re American Express*, 39 F.3d at 400; *see also In re Crazy Eddie Securities Litig.*, 714 F.Supp. 1285, 1291 (E.D.N.Y.1989) (dismissing RICO claim where racketeering acts were "directed not at Crazy Eddie but at the shareholders and the investing public.").

Plaintiffs rely on *Trautz v. Weisman*, 819 F.Supp. 282 (S.D.N.Y.1993), in which the residents of a facility for mentally ill adults alleged that a pattern of mail fraud involving misrepresentations made by the facility's owners to the New York State Department of Social Services ("DSS") proximately caused their injuries. Specifically, the defendants misrepresented to DSS that the squalid conditions that existed at the facility would be corrected, when the real purpose of those assurances was to maintain the facility's operating certificate. Proximate cause for the RICO claim was satisfied, according to Judge Goettel, because the operating certificate, procured by fraud on the DSS, resulted in the residents' Supplemental Social Security Income ("SSI") benefits being higher, thereby allowing the defendants to charge the residents a higher monthly fee for substandard care. Judge Goettel concluded that "it was the residents ... who were intended to be the ultimate targets of defendants' alleged scheme. Fraudulently securing renewals of the operating certificate was only a necessary step in eventually parting the ... residents from their SSI monies." *Id.* at 287.

■ I respectfully disagree with Judge Goettel's decision in *Trautz*. He based it on a premise not justified by the proximate cause requirements of *Holmes* (which the *Trautz*

opinion does not mention). Judge Goettel concluded that the plaintiff residents were the "alleged targets of the racketeering enterprise," *Trautz* at 287, ignoring the requirement that the "compensable injury necessarily is the harm caused by the predicate acts." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (emphasis added). *See also Hecht,* 897 F.2d at 21 ("[T]he RICO pattern or [racketeering] acts must proximately cause plaintiff's injury."). In short, the conclusion in *Trautz* that injury by the "racketeering enterprise" is sufficient to confer RICO standing ignores the "direct-injury limitation" adopted by Congress when it enacted 18 U.S.C. § 1964(c). *Holmes,* 503 U.S. at 272, 112 S.Ct. 1311.[6]

### 2. The 1962(b) Claim

Even if plaintiffs had alleged injuries resulting directly from the racketeering acts, more would be required to sustain their 1962(b) claim. Essentially, that section prohibits racketeers from muscling in on enterprises. The RICO plaintiff must therefore allege a distinct injury caused by the defendants' acquisition or maintenance of an interest in or control of an enterprise. *See Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062–63 (2d Cir.1996). Here, the alleged enterprise is the association of the defendants themselves. *See* Complaint ¶ 61. They are alleged to have "maintained their interest in and control of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b)." Complaint ¶ 64.

First, the claim must fail because plaintiffs do not allege any facts to support a finding that the defendants' "interest" in their "association" was acquired or maintained through the pattern of racketeering activity. *See Discon,* 93 F.3d at 1062. Second, plaintiffs have failed to allege injury stemming from the defendants' acquisition or

maintenance of that interest. *See id.* at 1063. Accordingly, the § 1962(b) claim must fail.

### 3. The 1962(d) Claims

Since I have held that the § 1962(b) and (c) claims do not state a cause of action, the RICO conspiracy claims, based solely on alleged agreements to commit the aforementioned acts, must be dismissed as well. *See Discon,* 93 F.3d at 1064.

### C. The State Law Claim

Plaintiffs assert a state law claim seeking the appointment of an administrator to manage the Medgar Evers Houses. In light of the dismissal of the federal claims, it is appropriate to decline jurisdiction over these state claims. 28 U.S.C. § 1367(c)(3). *See also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly if the federal claims are dismissed before trial ... the state claims should be dismissed as well."); *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir. 1993) (finding no abuse of discretion to dismiss state law discrimination claims where all federal claims had been dismissed before trial).

### CONCLUSION

The plaintiff's allegations, which I accept as true, cry out for relief. There may well be an avenue for such relief in state court, as plaintiffs' counsel acknowledged during oral argument. For the reasons stated above, however, the civil RICO cause of action is not a proper vehicle for these allegations.[7] The motion to dismiss is granted.

The Clerk of the Court is advised that this Order closes the case.

So Ordered.

---

**6.** I assume, without deciding, that the reliance element of the plaintiffs' mail and wire fraud racketeering acts is established by HUD's reliance on the fraudulent statements. *See Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo,* 148 F.3d 194, 196–97 (2d Cir.1998). The reliance element of a fraud claim is distinct

from the proximate cause element of a civil RICO cause of action.

**7.** Defendants raise various additional challenges to the RICO claims, which need not be addressed here.